1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF CALIFORNIA
2                            --oOo--

3   ANTHONY MARC MOSTAJO,        ) Docket No. 17-CV-350
    ET AL.,                      )
4                                ) Sacramento, California
                   Plaintiffs,   ) February 25, 2020
5                                ) 1:34 p.m.
            v.                   )
6                                )
    NATIONWIDE MUTUAL INSURANCE  ) Re: Motion hearing
7   COMPANY,                     )
                                 )
8              Defendant.        )

9
                    TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE JOHN A. MENDEZ
              UNITED STATES DISTRICT JUDGE
11
    APPEARANCES:
12
    For the Plaintiffs:      WORKMAN LAW FIRM, P.C. by
13                           MS. ROBIN G. WORKMAN
                             177 Post Street, Suite 800
14                           San Francisco, CA 94108

15  For the Defendant:       EPSTEIN BECKER & GREEN, P.C. by
                             MR. JAMES J. OH
16                           MS. KATHLEEN A. BARRETT
                             (pro hac vice)
17                           227 West Monroe Street, Suite 3250
                             Chicago, Illinois 60606
18

19  ALSO PRESENT:  Paul McKenzie

20
                 JENNIFER COULTHARD, RMR, CRR
21                   Official Court Reporter
                    501 I Street, Suite 4-200
22                     Sacramento, CA 95814
                      jenrmrcrr2@gmail.com
23                      (312)617-9858

24       Mechanical Steno - Computer-Aided Transcription

25

1              SACRAMENTO, CALIFORNIA, TUESDAY, FEBRUARY 25, 2020

2                               --oOo--

3        (In open court.)

4              THE CLERK:  Calling civil 17-350, Mostajo v.

5    Nationwide Mutual Insurance Company.

6              Counsel state their appearances, please.

7              MS. WORKMAN:  Good afternoon, Your Honor; Robin

8    Workman for the plaintiffs.

9              MR. OH:  Good afternoon, Your Honor; James Oh for the

10   defendant.  And with me is Kathleen Barrett from my law firm

11   and also Paul McKenzie, who is in-house counsel at Nationwide.

12             THE COURT:  Okay.  Have a seat.  Keep the microphones

13   in front of you.

14             The Court has before it a motion to certify the class.

15   There are two classes involved in this lawsuit in this motion.

16   The parties have agreed and stipulated that the Court can

17   certify the class for all former California employees employed

18   by Nationwide in the four years preceding the original date of

19   filing this lawsuit and the present who accrued vacation time

20   for which Nationwide did not pay them.  So the Court does grant

21   the motion with respect to that class.

22             The other proposed subclasses, I'm looking at the

23   proposed order is what I'm reading from at docket 63-4, is a

24   class of persons employed by Nationwide as commercial lines

25   claims adjustors in California in the four years preceding the

1    original date of filing this lawsuit and the present.  That is

2    opposed by Nationwide, and we'll take that up this afternoon.

3          Mr. Oh, you asked for or at least gave notice that

4    you'd like some additional time for argument.  I don't put

5    limits on oral argument, so that's why I didn't respond to the

6    request.  We take as little time as we need or as much time as

7    we need to discuss the motion and to respond to questions with

8    the idea that I really don't want lawyers simply repeating

9    what's in the briefs or treating it like an oral argument at

10    the appellate level.  It's really sort of a Q and A, my giving

11    you my view, allowing you to respond to make a record.  So I've

12    gone as long as 8 hours for oral arguments and I've taken as

13    little as 15 minutes for oral arguments.  So that's why I

14    didn't respond in writing to the request.

15          Okay.  Let me take up first just some side matters,

16    one being Ms. Workman you filed 26 evidentiary objections at

17    docket 87 but objected primarily or exclusively to Lisa Hughes'

18    declaration.

19          Mr. Oh, I'm not going to require you to respond to

20    that.  In as nice a way as possible, the objections were

21    unnecessary, but I've done this job long enough to know I can't

22    convince lawyers not to file documents like this, but it

23    doesn't help me at all.  It doesn't advance your arguments or

24    your claims or help your motion when I get a document like

25    this, quite honestly.  When I get a thousand pages of documents

involved in a motion, I see a motion or a document like that, I

just shake my head.  And again, I don't mean to sound like I'm

picking on you.  You're not alone.  Every lawyer that appears

in court does this.  It's how they're taught.  It's something

that I think law schools need to revisit, especially on a

motion like this, a motion for class certification, which is a

preliminary procedure, doesn't require strict adherence to the

federal rules of evidence.

There's a number of cases, some from our district

itself that make that clear, but no matter how many times I

tell lawyers that, it just doesn't matter.  There's just this

need to file objections for whatever reason.  I don't consider

it inadmissible evidence.  The courts self police.  I know when

someone is rendering an opinion or trying to state a fact that

there's no foundation, and so I'm not ruling on the evidentiary

objections; I don't need to.  And I've reviewed the evidence

that I consider to be relevant and/or admissible for purposes

of the motion.

The defendants, Nationwide, did bring a motion to

strike.  Ms. Workman raised a good point, Mr. Oh, that since

you've labeled it a motion, you should have told her beforehand

that you were going to file it.  Under my orders, you have to

meet and confer before you file motions.  But I also treated

this as, in effect, an evidentiary objection as opposed to a

motion to strike, and that's why I didn't deny it simply on

1    mere failure to meet and confer.

2         In terms of the motion to strike itself, I'm not going

3    to spend a lot of time on it.  Again, it is what it is, but it

4    really doesn't affect the Court's view of the motion to certify

5    the class.

6         I found Ms. Workman's opposition to be persuasive, to

7    be accurate, the cases that she cited and then relied on with

8    respect to Dr. Krosnick, who I think everyone is familiar

9    with -- he's no stranger to these types of proceedings -- that

10   her defense of his declarations, his testimony convinced the

11   Court that the motion to strike should be denied.

12        There are other courts that have written opinions,

13   particularly about the relevance or need for Dr. Krosnick's

14   testimony.  Again, we're at a preliminary stage here, folks.

15   His declaration, quite frankly, and his testimony for purposes

16   of the motion to certify the class doesn't carry much weight.

17   It's not really at the center of the plaintiff's arguments as

18   to why this class should be certified.  And it's, again, more

19   or less a side issue that distracted the Court from the more

20   important issue before it.

21        So I do find that his testimony at this point, for

22   purposes of this motion, is admissible with the caveat from

23   other cases that that doesn't preclude Nationwide in any way

24   from challenging whatever he may come up with at trial.  I

25   fully anticipate another motion in limine from you.  I really

1    don't know what exactly his testimony is going to be.  I mean,

2    you're accurate in the sense that he just says I plan to do a

3    survey.  I don't know what that survey is going to be.  He may

4    talk to all class members, he may take only a portion of the

5    class members.  I don't know how relevant or admissible that

6    testimony might be, but I don't have to reach those issues for

7    purposes of the class certification motion.  And again, so the

8    record's clear, Nationwide is in no way precluded from

9    challenging Dr. Krosnick's testimony at trial just because I

10   denied your motion to strike.

11        Okay.  Let's get into the class certification motion

12   itself.  Everyone knows the standards under Rule 23

13   requirements.  I will go through them.  Again, talking only

14   about the claims adjustors' subclass.  Here the subclass has

15   been approved.

16        In terms of the numerosity and ascertainability

17   requirement, that's not really challenged.  I do find that that

18   clearly has been met.  This case is somewhat unique in that

19   despite the significant number of these types of motions that

20   I've had over the years, as I understand it, this motion only

21   involves one office, right?

22        MS. WORKMAN:  Yes, Your Honor.

23        THE COURT:  Okay.  The number changes a little.  I'm

24   not sure if it's 102 or 110 or approximately 110, but I know

25   it's around 100, maybe a little more, but it is at least -- it

1   clearly meets numerosity and ascertainability requirements.

2   But as I would note, it's the first motion for class cert where

3   we're really talking only about one office and in that we'll

4   talk about a little more as we go through the other

5   requirements.

6        The key issue in these motions is the commonality

7   requirement, that plaintiff needs to demonstrate that there are

8   questions of law or fact common to the class.

9        A case that the plaintiffs rely on talks about that a

10  great deal, the *Jimenez* case, the Ninth Circuit case from 2014,

11  *Jimenez v. Allstate*, which the Ninth Circuit affirmed the

12  certification of the class.  The Ninth Circuit in that case

13  writes, "The commonality only requires a single significant

14  question of law or fact."

15       The Ninth Circuit indicated that in *Jimenez* that it

16  agreed with the district court's finding that there were three

17  common questions identified in the case that had the capacity,

18  because of the close relationship with the three prongs of the

19  underlying substantive legal test, to resolve the principle

20  issues in the case.

21       The 23(a)(2) commonality requirement requires common

22  questions that are apt to drive the resolution of the

23  litigation.

24       And in the case before this court as well as *Jimenez*,

25  the Ninth Circuit indicated that a plaintiff can establish

1    liability for an off-the-clock claim by proving that he

2    performed work for which he did not receive compensation, that

3    the defendants knew or should have known that the plaintiff did

4    so and that the defendant stood idly by.

5            In reviewing all the declarations testimony,

6    deposition testimony, exhibits that were submitted to the Court

7    on this motion for class certification, that's what I focused

8    on.  Is this a case where the common answers are apt to drive

9    the resolution of litigation?  What really are the underlying

10   legal claims that have been raised here?

11           In looking at the case law, plaintiffs' reliance on

12   *Jimenez* is understandable.  It is, without question, the case

13   that is closest to this case before the Court today.  It was

14   helpful.

15           I actually had an opportunity to read the district

16   court opinion as well, but it's almost identical, virtually

17   identical to what I have before me today.  Plaintiffs' reliance

18   on other cases was helpful where classes were certified by the

19   courts but, without any question at all, *Jimenez* certainly

20   drives the plaintiffs' argument and supports the plaintiffs'

21   argument here that I should certify the class, particularly on

22   the commonality issue.

23           Nationwide, of course, has challenged *Jimenez*,

24   attempting to distinguish the case, arguing that there are

25   material variations and the Court should not rely upon *Jimenez*.

1    Nationwide argues that the facts differ because there's no

2    evidence that the policy did not apply uniformly to the class,

3    nor was there any evidence that many members of the class

4    reported and received pay for all the hours they worked.  They

5    argue that it's material that the time-keeping systems were

6    different, that Nationwide has a system that looks at actual

7    time worked rather than a default schedule of hours.

8         In *Jimenez* it was the managers that entered the

9    employees' time where in this case the employees themselves

10   entered their time.

11        And Nationwide also argued that it's material that the

12   class was subject to common management; whereas, here there are

13   enormous variations with management policies regarding

14   overtime.  But the two cases are similar in that both in

15   Allstate's case and in the Nationwide case they both had, at

16   least on paper, a policy that indicated that they would comply

17   with California law, that they would pay for overtime, that

18   that was the practice.  And both of these cases involve really

19   unofficial policies that are being alleged, basically a policy

20   to ignore the written policy.  Nationwide also relies on three

21   cases that it has argued are better suited for the facts at

22   hand*:  Howard v. CVS Caremark Corp*, *Garcia v. Sun Pacific*

23   *Farming Cooperation* and *Castillo v. Bank of America*.

24        Defendant Nationwide has argued that these three

25   cases -- the Court should rely on these three cases, and these

1    cases support the conclusion that plaintiffs have not

2    established commonality because they all share the same kind of

3    evidentiary dispute.

4            In plaintiff's reply, the plaintiff does an excellent

5    job of distinguishing those three -- those three cases that are

6    relied upon by Nationwide in this case.  There is a discussion

7    about how this Court should be wary of Nationwide's

8    declarations from employees who their declarations are used to

9    oppose the declarations submitted by plaintiff in support of

10   the motion itself, arguing that such declarations are

11   inherently suspect.

12           They did point out, and eventually it was corrected,

13   that there were not any certifications, so I would take them at

14   their word.  And there is evidence from the Court that at least

15   in the notice of errata that voluntary consent forms were

16   signed and discussed with the declarants or the defendant.  But

17   the argument I found to be most persuasive is the argument

18   raised in the reply where the plaintiffs argued that the

19   defendant did not provide anything that adequately challenges

20   their present sufficient evidence.  I think you submitted, what

21   was it, 16 declarations?

22           MS. WORKMAN:  Yes, Your Honor.

23           THE COURT:  Okay.  To support the typicality and

24   commonality requirements.

25           Plaintiffs also point out and the Court made note of

1   this in reviewing all of this paperwork that the defendants

2   didn't submit any manager declarations.  I found that

3   interesting.  There's no manager, no person most knowledgeable,

4   no CEO, no one who drafted the policy that in writing says

5   we're going to comply with California's requirement to pay

6   nonexempt employees overtime.  There's no manager declarations

7   that refuted plaintiff's 16 declarations from claims adjustors

8   who, in their testimony, clearly stated that they worked off

9   the clock, they weren't paid and they had been telling the

10  managers that they worked off the clock.

11          The only real manager testimony is from Angela

12  Haggerty who, at one point, was a claims adjustor and then

13  moved into management.

14          And while, Mr. Oh, I did read the depositions as well

15  and recognize that in the depositions you got some excellent

16  answers, from your point of view, that seem to contradict the

17  declarations, it still didn't persuade the Court that there

18  isn't clearly a commonality showing here in this case.

19          Plaintiffs argue, and I agree with the argument, in

20  the reply brief that the defendant is wrong to assert that

21  there's, quote, "No clear evidence of a class-wide policy

22  permitting off-the-clock Work" merely because their policies

23  facially comply with California's overtime law.  Plaintiffs

24  again cite to both *Jimenez* and *Mahoney* for support since both

25  cases rejected the exact same argument.

1          In *Mahoney* the Court stated that "Supervisors informal

2     pressure not to request overtime and the actual refusal to

3     grant overtime were evidence of a

4     policy-to-violate-the-policy."

5          Plaintiffs also highlighted pertinent exhibits that

6     helped establish that there was a uniform practice.  Plaintiff

7     cited to Nationwide's written policy, resting claims on

8     overtime guidelines from August of 2010 that explicitly stated

9     that claims adjustors, quote, "Must request approval from their

10     manager prior to working overtime," closed quote.

11          Plaintiffs concluded their argument by maintaining

12     that the cases that they cited, again, are virtually identical

13     to their facts and that the defendant has, quote, run from

14     these authorities by citing distinguishable cases.

15          In looking at motions to certify the class, in the

16     practical sense, judges look at these and try to decide is this

17     a case that I can try without having to call a hundred

18     witnesses.

19          Are there issues in this case at the core that would

20     allow the Court and/or a jury to determine the liability issue.

21     And, again, this one is a little different from most of the

22     class certification cases that I've seen.  And I'll be honest

23     with you, if you check -- if there was a way to check this

24     Court's view of motions for class certification -- Ms. Workman

25     you may have done this -- I'm not a big fan of class

1    certification motions and class actions.  In most of the cases
2    I do see that individual issues predominate, that I would be
3    required to consider whether the individual plaintiff worked a
4    certain number of hours, how many hours did they Work, what did
5    they report, what did they not report, and those issues take up
6    most of the case.

7              This one's a twist because this one focuses on what
8    did Nationwide do.  What did or didn't Nationwide do.  It
9    places much more of a focus on the employer.  I think liability
10   could easily be determined simply by having testimony about
11   whether there really was this policy to ignore the policy.

12             Again, that's why I think as this case goes forward,
13   there may be a need to contact and/or depose managers.  I
14   actually think the managers become the most important witnesses
15   in this case and/or persons most knowledgeable from Nationwide,
16   you know?  What did the managers tell their claims adjustors?
17   Did Nationwide, as an entity, make it clear that California
18   claims adjustors would be expected to perform their jobs
19   without reporting overtime?  Did managers actually state that
20   if the claims adjustors in California did not do their job
21   without requesting overtime that that would be viewed as that
22   they were unable to perform their job, that they would be
23   viewed as inefficient?  Did the claims adjustors routinely work
24   in excess of eight hours and did the managers know that?

25             And what I'm saying to you is while I think clearly

1    the commonality requirement has been met here, that doesn't

2    mean and you shouldn't take my comments as indicating that you

3    have absolutely no defenses to these claims.  In fact, your

4    whole approach -- not your whole approach but your primary

5    approach is this policy exists only in the minds of the

6    plaintiffs.  It didn't exist in reality.  But I can see this

7    clearly as a case with that focus on what Nationwide did or

8    didn't do as an entity.  Did this policy to ignore the written

9    policy really exist?  That's going to resolve the liability

10   issue, and that's really what you're looking for in a

11   commonality requirement.

12          And again, relying on *Jimenez*, which I know you want

13   to distinguish, but I don't see the distinction in such a way

14   that I should not rely on it, in relying on that case I clearly

15   do see that the commonality issue has been met.

16          And specifically as in the case of *Jimenez* I find as

17   follows:  That the plaintiffs have presented sufficient

18   evidence demonstrating affirmatively that the following common

19   question is present:  Whether defendant had a common or

20   widespread practice of not following its policies regarding the

21   overtime.

22          I also find, as in *Jimenez*, that there are in this

23   case common questions that pertain to what the defendant knew

24   or should have known in part.  That common question, again, is

25   based primarily on plaintiff's declarations but also in part on

1   Ms. Haggerty's declarations and evidence.

2           And there's a third common question as in *Jimenez* in

3   this case as to whether Nationwide stood idly by knowing or

4   that they should have known what was going on.

5           So having satisfied the commonality requirement, the

6   Court's moved to typicality.  In the typicality requirement the

7   plaintiff is required to show that the parties are typical of

8   the class that tests whether other members have the same or

9   similar injury, whether the action is based on conduct which is

10  not unique to the named plaintiffs and whether other class

11  members have been injured by the same course of conduct.

12          This is a permissive standard that does not require

13  claims to be substantially identical.  They only have to be

14  reasonably coextensive with those of absent class members.

15          Plaintiffs have argued that their claims are typical

16  of those of the class because they arise from the same remedial

17  and legal theories.

18          Defendant argues, again, combining, in effect, both

19  the typicality and the commonality requirements that the

20  absence of class-wide questions susceptible of class-wide proof

21  that can generate class-wide answers demonstrates the lack of

22  both commonality and typicality.  And I disagree with that

23  finding that there is commonality.  I think it follows clearly

24  that there is typicality exhibited here as well.

25          Damages is not necessarily at play in a motion for

1   class cert, particularly not this motion for class

2   certification, as Ms. Workman points out.  You can't deny class

3   certification simply on the damages issue, and *Jimenez* makes

4   that clear as well and other Ninth Circuit cases.

5         Given the lack of testimony that plaintiffs suffered

6   unique injuries, injuries unique only to them, I do find that

7   these plaintiffs have satisfied the typicality requirement.

8         There's an adequacy of representation requirement.

9   The parties have briefed that as well, obviously.  That

10  requirement focuses on two questions, whether the named

11  plaintiffs and the counsel have any conflicts of interest and

12  whether the named plaintiffs and their counsel prosecute the

13  action vigorously on behalf of the class.

14        Plaintiffs have argued they have no conflicts with the

15  proposed class members.  Their counsel are experienced in the

16  prosecution of class action lawsuits and have vigorously

17  prosecuted this case at all times.

18        Defendant didn't really oppose this contention and the

19  Court does make the finding that plaintiffs have satisfied this

20  requirement.

21        Plaintiffs are pursuing certification under Rule

22  23(b)(3).  That requires a showing that common issues

23  predominate over individual ones and that the class action is

24  superior to other available methods for fairly and efficiently

25  adjudicating the controversy.  These two issues are

1   interrelated.  Satisfaction of the predominance test thereby

2   means that the just adjudication of common issues will help

3   receive judicial economy.

4          I don't think there's any question, given the Court's

5   other comments and views of the evidence in this case, that

6   common questions clearly predominate here.  This whole

7   liability issue can, as I've already stated, be resolved

8   through the use of and focus on the three common issues that I

9   just discussed.

10         And again, as plaintiffs rely on *Jimenez*, this Court

11  relies on *Jimenez* in finding that the predominance requirement

12  has been satisfied.

13         Plaintiffs have argued that *Jimenez*'s application of

14  the general rule that the more narrowly defined the class and

15  the more evidence of a controlling company-wide policy, the

16  more likely it is that the class will be permitted to proceed.

17         Again, this case is unique.  It involves one office,

18  approximately 100 potential plaintiffs and all those I think

19  weigh in favor of a finding of commonality in that common

20  issues will predominate over individual issues.

21         Defendants have, in effect, argued for the same

22  reasons they argued that commonality doesn't exist, that common

23  issues will not predominate, but the Court did not find that

24  argument to be persuasive.

25         Defendant, again, relies on *Howard*.  Defendant also

1   has asked the Court to rely on *Koike*, K-O-I-K-E *v. Starbucks*

2   *Corporation*.  And in that case it was determined that the

3   plaintiffs did not satisfy the issue.  The common issues

4   predominated over individual issues.  Those are evidence that

5   did not prove that a single assistant store manager had worked

6   off the clock, and Starbucks had submitted declarations showing

7   the opposite.

8        Again, I find that *Jimenez* is more similar to the

9   facts -- to the case at hand than the cases that Nationwide has

10  submitted in support of its arguments.

11       In *Jimenez* the defendant, again, argued that common

12  questions did not predominate because there was a myriad of

13  individualized inquiries.  Defendant based the argument on the

14  fact that the plaintiffs' theory allegedly rested on discrete

15  decisions by individualized actors rather than an overarching

16  policy.

17       And the defendants, likewise, submitted statements of

18  current employees to prove that some employees were, in fact,

19  reporting overtime and getting paid for it.  Nevertheless, the

20  *Jimenez* court found that common questions did predominate.

21       Along with a Seventh Circuit case, the *Jimenez* court

22  found it significant that the proposed class in *Jimenez* was

23  only 1,129 people.  In this case plaintiffs' proposed class is

24  much smaller, only approximately 100 -- somewhere between 102

25  and 110 claims adjustors, all of whom worked in one office.

1       The *Jimenez* court also found that there were some

2   individual issues concerning the discretion of individual

3   managers, but it was a lesser amount of discretion based on a

4   common state-wide policy to violate the policy.

5       And likewise, in *Ross* the Court found that because the

6   off-the-clock claim required no proof of individual

7   discriminatory intent, there was room for slight variations in

8   how the defendant enforced its overtime policy.

9       The *Ross* court found it sufficient that plaintiffs'

10  theory was supported by class declarations alleging that they

11  were denied lawfully due overtime compensation in spite of the

12  variations on how these denials might have been enforced and it

13  ultimately found slight variations were fine because the class

14  maintained a, quote, "common claim," closed quote, of a, quote,

15  "broadly enforced," closed quote, policy of denying overtime

16  compensation.  This broad policy was the common answer that

17  potentially drives the resolution of the litigation.

18      And in this case before the Court today, although

19  there are slight variations on how each manager enforced the

20  overtime policy, the unofficial policy that's alleged is that

21  it violated the written overtime policy, and that's the common

22  issue that predominates.  So the Court does find that the

23  plaintiffs have satisfied that requirement.

24      And then finally, in terms of superiority, there's no

25  question in this Court's mind that the class action would be

1    the superior mechanism for handling this case.  I certainly do

2    not want to see 110 individual cases filed in the Eastern

3    District of California, given our current caseload and

4    seriously given the Court's view of how these common issues can

5    resolve the liability issue.  It makes complete sense to the

6    Court in terms of a manageability and efficiency point of view

7    that we should proceed by way of a class action here.

8         This really is the only issue where Dr. Krosnick's

9    testimony might come into play.  Again, the plaintiff's use of

10   his testimony really didn't weigh very heavily in the Court's

11   decision.  And again, I'm not sure what his survey and/or

12   testimony might look like.  It might assist the Court in

13   managing the class action, it may not.  I'll really have to

14   wait and see what the final report looks like.  But plaintiffs

15   do, in effect, raise that as further evidence that this class

16   action would be manageable and they will rely in part on

17   Dr. Krosnick to help with that manageability.

18        That satisfies all the requirements of a motion to

19   certify this class.  And having found that plaintiffs have met

20   their burden of satisfying the Rule 23(a) and (b)(3)

21   requirement, the Court is granting the plaintiffs'

22   certification of the claims adjustor subclass.

23        Ms. Workman, I assume you do not disagree with the

24   Court's opinion, but you may raise any comments that you want

25   for the record.

1    MS. WORKMAN:  I do not disagree with the Court's

2    recitation or conclusions.  The only thing I wanted to make

3    sure that I'm absolutely clear with the Court, so the Court --

4    there is one office -- because I anticipate this argument

5    coming from the other side, there was only one office in

6    California, the Sacramento office.

7        THE COURT:  Right.

8        MS. WORKMAN:  As in *Jimenez*, some of these adjustors

9    did Work out of their homes.  Even if they did, for example,

10   Ms. Quedens, her supervisor was in the Sacramento office but I

11   wanted to make sure that the Court understood that.  I tried to

12   make it clear in the papers, but I just wanted to make sure

13   that that was clear.

14       THE COURT:  No.  Understood.

15       Okay.  Mr. Oh, you may comment --

16       MR. OH:  Your Honor --

17       THE COURT:  -- and make your record.

18       MR. OH:  Thank you, Your Honor.

19       As you were walking through the elements of the Rule

20   23 and how you were thinking, I was thinking, okay, it's

21   halftime and I'm down two scores and we get to the third

22   quarter and now I'm down three scores and now we get to the

23   2-minute warning and I'm down four scores and so -- and now

24   you've already apparently ruled and the game is over and the

25   chances of calling the refs back on the field to see if they

1    can change the -- you know, put some more time on the clock

2    seems pretty slim, but if you -- I would appreciate some time

3    to try to change your mind.  I know it is a extremely high hill

4    to climb, but do you --

5            THE COURT:  I mean, the only -- honestly, I do that

6    because the only basis for you changing my mind is if you think

7    I missed something.

8            MR. OH:  I do.

9            THE COURT:  And that's why I don't allow lawyers

10   simply to come in here and simply repeat what's --

11           MR. OH:  Understood.

12           THE COURT:  -- before me.  I read everything, I look

13   at everything.  I take my responsibility seriously.  It doesn't

14   help me for you to simply sit there, but I want to give you an

15   opportunity because, look, these motions are appealable.  I'm

16   not going to have the time, unfortunately, to issue a written

17   opinion.  The hearing, itself, is going to have to serve as, in

18   effect, the Court's written opinion.

19           I will take, Ms. Workman, your proposed order and I do

20   want to go through that with the parties, but primarily that's

21   the only order that would be issued.  But the underlying

22   thought process and the reason why the Court reached the

23   decision it did is obviously set forth in the transcript,

24   but --

25           MR. OH:  Maybe the one question I ask --

1          THE COURT:  But go ahead if you -- I mean, you need

2    to -- I mean, you already have your record in terms of the

3    extensive briefing and exhibits are obviously part of the

4    record, but feel free to --

5          MR. OH:  Thank you.

6          THE COURT:  -- tell me what you think I missed.

7          MR. OH:  If you gave me 15 to 20 minutes and if I give

8    you enough to think about, would you perhaps defer ruling until

9    you've looked at some of the additional --

10          So we didn't file a sur reply.  We understood we --

11   both sides gave you thousands of pieces of paper.  You didn't

12   want us to file a reply brief in support of our motion to

13   strike, so we honored that request and -- but there are some --

14   and I was looking at this hearing as potentially ability to

15   provide a little bit of a sur reply and show you some documents

16   and show you, quite frankly, a little bit of a demonstrative

17   that shows why there is no uniform policy to violate the

18   policy.  And if I get that chance --

19          THE COURT:  But that goes to the merits.  Again --

20          MR. OH:  No.

21          THE COURT:  -- you got to be careful about -- and I

22   see this all the time, obviously, in motions for class

23   certification -- the defense lawyers go immediately to the

24   merits of the underlying claim.  And you and I both know that

25   that's not the issue here.  The issue is how can this case best

1   be tried.  Do I really need to hear from 110 individuals, or

2   can liability issue be resolved?

3          MR. OH:  I know you don't like people saying "with all

4   due respect," so I'm not going to say that.

5          THE COURT:  Right.

6          MR. OH:  I disagree that -- if you frame the question

7   the way Ms. Workman framed it, is there a uniform policy -- a

8   uniform policy to violate the policy, not did people work off

9   the clock.  I'm not saying that.  And I know that there's

10  testimony from the plaintiffs, the named plaintiffs, that they

11  worked off the clock, but there is also a lot of conflicting

12  evidence that people did not work off the clock, and so that

13  conflicting evidence shows a lack of commonality but also, more

14  importantly, in terms of the question of whether or not there

15  was evidence from managers.  Yes, we made a call, based on

16  Angela Haggerty being a manager, Darlene Braasch being a

17  manager and the admissions I got at depositions about what

18  these declarants from the plaintiff told them, that there is

19  sufficient evidence from managers in the record that they did

20  not discourage people from reporting all overtime.

21         THE COURT:  Let's stay on that because I do want to

22  give you an opportunity to address that issue.  You know that

23  was a concern of mine.  And I would disagree with you there.

24  There's nothing from your side, there's no one standing up, at

25  least not at this point, but no one in a position of authority

1    from Nationwide telling me there's no merit to these people's

2    claims.  That simply didn't happen at Nationwide that we had a

3    written policy that was clear to everyone and we followed that

4    policy.  That evidence isn't in this record at that time.

5    Maybe there is no person at Nationwide that could testify to

6    that, but it just -- it may have made a difference to me

7    obviously --

8               MR. OH:  Your Honor --

9               THE COURT:  -- that there is someone at Nationwide

10   that, in effect, is saying what you want this Court to or jury

11   to ultimately conclude and that is this policy to violate our

12   policy existed only in the minds of these disgruntled

13   employees.  That's not before me right now.

14              MR. OH:  Oh, there are a ton of facts in the record,

15   facts that are statements in deposition testimony and in emails

16   that were put before you that demonstrate that management did

17   not countenance off-the-clock work; encouraged people to report

18   all of their time.  Even if they did not get preapproval to

19   work the overtime, they were paid for it.  There is a ton of

20   evidence and there is facts in the record from managers saying

21   that there were -- that we are following our policy and that

22   there is no policy to violate the policy.

23              And imagine what Ms. workman would have said --

24              THE COURT:  I would disagree with your use of the word

25   "ton," but -- I didn't see that.  I mean, again, I saw answers

1    in depositions in which you got Ms. Haggerty to admit that she,

2    in effect, never -- she didn't encourage her, when she was a

3    manager, employees to falsely report their time.  She didn't

4    tell them not to report their overtime.  There's nothing in --

5    that's no emails, there's no writings in which a manager is

6    saying, "Look, everybody knows the policy here, you can't work

7    overtime" or "You can't work more than two hours overtime."

8    That's a hurdle that Ms. workman's going to have to deal with

9    in terms of is there underlying documentation, proof, written

10   proof of the policy to violate the policy.  Still doesn't

11   change my view of the case that the focus of this case is on

12   Nationwide.  That's why I say it's somewhat unique.  It's not

13   on the plaintiffs so much as it's on Nationwide.  And that

14   lends itself to -- because all the -- most of the class members

15   are claiming the same exact thing in terms of determining that

16   liability issue.  If it's determined that, again, that that

17   policy to violate the policy just never existed, that managers

18   didn't know about this policy to violate the policy, no one

19   ever told them there was this policy or practice to violate the

20   written policy and that managers never turned their back on the

21   fact, all that obviously lends to a verdict that goes in favor

22   of your client.  But, again, that's not my -- that's not my

23   concern at this stage of this litigation.  The question is can

24   I try those common issues more efficiently, more effectively as

25   a class action.  And, again, relying on *Jimenez*, which is --

1    that's your biggest problem --

2             MR. OH:  Well --

3             THE COURT:  -- relying on *Jimenez*.

4             MR. OH:  That's one of the things I think you are

5    missing and that is *Jimenez* -- there are two similarities

6    between *Jimenez* and this case.

7             THE COURT:  Again, if you're going to reargue what's

8    in your brief, I know what you argued in your brief.

9             MR. OH:  But that's -- you asked me to tell you what

10   you were missing, and I'm telling you that --

11            THE COURT:  But I read that argument and I didn't find

12   it persuasive.  And if you can't overcome --

13            MR. OH:  Do you --

14            THE COURT:  If you can't overcome *Jimenez* and my

15   reliance on *Jimenez* -- and again, that would be an issue on

16   appeal, am I wrong in basically saying this court is *Jimenez*.

17   The Ninth Circuit has told me in almost a virtually identical

18   case that the class should be certified.  I know you tried to

19   distinguish it, I read how you tried to distinguish it, but I'm

20   just not persuaded.

21            MR. OH:  Maybe what you're missing, Your Honor, is

22   that -- you do understand the difference between exception

23   reporting controlled by the managers and the Nationwide time

24   tracking system that has been in place since 2005 and how it is

25   the actual claims adjustor who put in his or her time daily --

1          THE COURT:  I understand that.

2          MR. OH:  -- puts in his or her time weekly --

3          THE COURT:  Sure.

4          MR. OH:  -- as opposed to exception reporting, which

5    is you are presumed -- it's a rebuttable presumption that you

6    worked only 40 hours in a week and it's the manager who puts

7    that time in and then it's the manager who has to be talked to,

8    to even say that I worked overtime as opposed to the employee

9    putting that in.  And that's why this is properly an

10   employee-focused case and not a -- not only a

11   Nationwide-focused case.  And this is also a manager-by-manager

12   situation.

13         And I'm going to -- I'm going to throw the Hail Mary

14   right now.  Can I throw the Hail Mary right now, Your Honor?

15         THE COURT:  Keep going.  If I think you're just

16   repeating what's in your brief, obviously I'm not shy about

17   cutting you off, so . . .

18         MR. OH:  Okay.  Mind if I step up to the podium?

19         THE COURT:  As long as you got a microphone in front

20   of you, wherever you feel more comfortable.  It's just my court

21   reporter has to hear you.

22         MR. OH:  I do want to point out that there is -- James

23   Ryan is a lawyer.  He kept calling me "counselor" when I was

24   taking his deposition and I would say that he was, in my mind,

25   a very candid, open and honest witness and he had four managers

1    during the course of his employment at Nationwide in California

2    as a claims adjustor:  Cynthia Cowles, Deb Rodriguez, Carrie

3    Ulrich and Justin Zaharris.

4         In terms of managing this trial and not having to call

5    all 100 potential class members, he is the witness who shows

6    you that you have an unmanageable trial, Your Honor.  And that

7    is because from manager to manager to manager to manager their

8    words that he said to him that he admitted to under oath were

9    not the same policy, that the manager who -- it depended on who

10   the manager was and at what point in time and how busy they

11   were as to how lenient or not they were on overtime.

12        And when you look at Justin Zaharris, the last manager

13   for Mr. Ryan, in the last 15 weeks that he worked at

14   Nationwide, he reported, on average, about 5 to 6 hours of

15   overtime a week and he said he got no pushback whatsoever from

16   Mr. Zaharris, who encouraged him to report all of his time.

17        THE COURT:  Where's the declaration from those

18   managers?

19        MR. OH:  What's that?

20        THE COURT:  Where's the declaration from those

21   managers?

22        MR. OH:  Why do I need -- okay.  Here's another thing

23   I think you're missing:  The plaintiff has the burden of proof.

24   We don't have the burden to disprove, Your Honor.

25        THE COURT:  I understand.

1     MR. OH:  The plaintiff has the burden of proof.  The

2   plaintiffs did not take one 30(b)(6) deposition themselves of a

3   company representative to testify as to company policy.

4     It's not our burden to do her job for her, especially

5   when we feel we have pretty damning admissions, pardon the

6   language, from actual class members who show that the policy

7   differed from manager to manager to manager and from time to

8   time.  And so that's why you're going to have to call in every

9   single manager at a minimum.  And then you're going to have to

10  call in the people who reported to them because James Ryan

11  testified that under different managers at different points in

12  time the overtime policy and what he felt from his manager --

13  and that's why their reaction, their subjective reaction to

14  each of their different managers was important.

15     Another -- here's one document I'd really like to show

16  you.  Actually, there are two emails, Your Honor.

17     So Joe Canto is another declarant who was deposed.

18  When he got a new manager, Angela Haggerty, the first thing he

19  did was he asked her the question:  What are your rules on

20  overtime?  What are your rules?

21     And then Angela Haggerty answered him by saying, "Use

22  your best judgment.  Use your best judgment and if you are

23  going to work overtime, just let me know."

24     So, number one, that's inconsistent with the

25  plaintiff's theory that you had to get preapproval all the

1   time; and number two, it goes to show that when Joel Canto got

2   a new manager, he had to ask her "What are your rules on

3   overtime," which shows that it is a manager-by-manager inquiry

4   and that it's a person-by-person inquiry and it's subject to

5   both that manager's interpretation of Nationwide's rules and

6   the employee's interpretation of the rules.  And that's why it

7   is -- you're going to have to call in every single employee to

8   testify:  Who was your manager at this point in time and what

9   was her rule or his rule and how did they enforce it.  And that

10  is the farthest thing from there being a uniform policy.  And

11  that's why the conflicting evidence in the record demonstrates

12  that this is not a situation of predominance over -- of common

13  issues over individual ones.

14          One of the other -- so with regard to Ms. Haggerty, I

15  know that Ms. workman made a lot of focus on Darlene Braasch

16  and the overtime that she worked and then she allegedly

17  attached the most incriminating email that she realized that we

18  had produced to her after falsely accusing us of not.  That

19  most incriminating email is one example and the only example in

20  the record that I could find of an actual overtime request

21  being denied.  One.

22          And the lead-up to that was that Darlene Braasch, from

23  January to October of that year, had worked and been paid for

24  $10,000 worth of overtime in a year.  And then Darlene Braasch

25  reported to Angela Haggerty who reported to Carolyn Crawford

1  who reported to Ann Bender.  Ann Bender saw this and said,

2  "What's going on with Angela Haggerty; she has five times more

3  overtime than anybody else in the unit," which, in and of

4  itself, shows disparity.

5       But then -- so then on the heels of that inquiry from

6  Ann Bender, Ms. Braasch made a request for 34 hours of overtime

7  to be worked between December 5 of 2017 and Christmas.  That

8  was the one overtime request that was denied.  That is not

9  evidence of a big policy to discourage overtime.  It was a

10 unique individual circumstance.

11       And when I asked Ms. Haggerty at her deposition,

12 "Well, did this apply to Joel Canto?  Did this overtime request

13 being denied apply to Joel Canto?"  Her answer was, "No.  This

14 applied to Angela Haggerty.  This is an

15 individual-by-individual -- overtime was an

16 individual-by-individual case."

17       That was the admission that told me, coming from a

18 manager at Nationwide, that we don't need a declaration from a

19 manager at Nationwide because that is exactly how things

20 worked.  It was manager to employee, "What's your workload

21 right now?  Why do you need the overtime?"

22       Or you go to a James Ryan who, under Justin Zaharris,

23 did not have to ask for overtime at all, he just put it in and

24 it was granted.

25       So when you have two different managers within the

1    same year having different policies with respect to their own

2    unit, that shows that every manager needs to come in and

3    testify and then every person in the unit needs to come in and

4    testify as to how did they interact with their manager about

5    overtime.  That's not a policy to violate the policy.  That's

6    multiple different policies.  And that's why class

7    certification is simply inappropriate.

8              THE COURT:  Do you want to respond to that?

9              MS. WORKMAN:  Yes, Your Honor.

10             THE COURT:  Go ahead.

11             MS. WORKMAN:  First, I think if you look at what my

12   burden of proof is, preponderance of the evidence, have I

13   submitted to the Court sufficient evidence that a trier of fact

14   could determine by a preponderance of the evidence there's a

15   policy to violate the official policy?  I believe I have.  And

16   the things that counsel is raising were presented to the

17   *Jimenez* court and *Mahoney* court and the *Williams* court.  In

18   every case the defendant has some evidence.  They have some

19   declarations.

20             The question is, is the evidence I presented this

21   Court, these 16 declarations, the written policies and the

22   phalanx of emails where they're denying overtime, making

23   preapproval of overtime, the exact evidence the *Jimenez* court

24   told me I needed to present to Your Honor to get certification?

25   Because of that we've met that burden, and that's why in this

1    case certification is appropriate.  They're going to have

2    defenses, of course, but that does not mean that certification

3    is not appropriate.

4          THE COURT:  Okay.  Anything else you want to raise in

5    your Hail Mary?

6          MR. OH:  Thank you, Your Honor.  Guess I got to work

7    on my arm a bit here.

8          So with regard to the question of whether or not

9    Nationwide stood idly by, that also, when you look at -- I know

10   that there were thousands of pages that were given to you, but

11   there are some nuggets in there that show that Nationwide did

12   not stand idly by.

13         THE COURT:  There's a lot of nuggets.  I told you

14   there's a lot of nuggets.

15         MR. OH:  And so -- but that shows you, Your Honor,

16   that that is why each person who comes in and testifies or each

17   adjustor's going to have to come in and testify and say that --

18   and be asked about their manager and what their rule for their

19   manager was at a given point in time.

20         The email that I was referring to with regard to Joel

21   Canto was at document 82-1 at page 148.  "Angela, what are your

22   rules for overtime?"

23         Under Myron, pursuant to Carolyn's statements in prior

24   meetings, she said, "If we needed to work overtime, then we

25   could as long as we were working.  So, we were working overtime

1    as needed."  It's not saying we're working -- had to get

2    preapproval or that there was people discouraging us from

3    working overtime and yet we were still do it.  He was saying we

4    were working overtime as needed under Myron Polivka, his prior

5    manager, and that as soon as he switches over to Angela

6    Haggerty he asks her, "What are your rules for overtime?"

7              And so in terms of the manageability of this case,

8    Joel Canto is going to have to come in and testify as to how

9    the rules were different under the two different managers.

10       And with regard to the different -- one office, Your Honor,

11   there is one Nationwide office in California --

12             THE COURT:  In Sacramento.

13             MR. OH:  -- in Sacramento.

14             THE COURT:  Right.

15             MR. OH:  But, functionally, who controlled the

16   different units?

17             And you asked me what you missed.  One of the things

18   that you may have missed, Your Honor, is that the construction

19   defect unit, which was the source of a lot of the angst, I

20   think, in this case, quite frankly, it's the Darlene Braasch,

21   Angela Haggerty, Carolyn Crawford, Ann Bender line of

22   reporting.

23             Joel Canto testified at his deposition that that was

24   functionally a home office unit.  So while Joel Canto worked in

25   the Sacramento office, as did Angela Haggerty, Carolyn Crawford

1   actually worked in Michigan and Ann Bender was in Columbus.

2   They didn't report in to Sacramento.

3           And the overtime and expenses and performance reviews

4   and management of the different files and what the workloads

5   were, were not controlled out of Sacramento.  They were

6   controlled out of home office.

7           Similarly, there are a number of declarants, such as

8   Stefani Lavitt and Pamela Lewis, who were commercial property

9   in Southern California.

10          Pamela Lewis, when I took her deposition, yes,

11  nominally assigned to Sacramento.  She visited -- she couldn't

12  remember if she visited the Sacramento office in her three

13  years of working at Nationwide once, twice or three times and

14  that was it.  She worked Southern California.  She would be

15  driving to and from her -- and visiting these losses of

16  commercial property.  Her boss was in Scottsdale, Arizona, Tami

17  Wolf.  Her boss was in Scottsdale, Arizona.  So while she's

18  nominally assigned to the Sacramento office for administrative

19  purposes like, you know, here's your HR person if you've got a

20  problem --

21          THE COURT:  Again, the significance of all of that?

22          MR. OH:  Because you placed significance on it, Your

23  Honor, that one office --

24          THE COURT:  I placed significance because it's a much

25  easier class to deal with than almost 99 percent of the other

1    classes that I deal with.  It's easier to --

2         MR. OH:  I hate telling a federal court judge that

3    he's wrong --

4         THE COURT:  It's easier to do this.

5         MR. OH:  -- but you're wrong.  I'm going to tell you

6    that you're wrong, Your Honor, that you got hung up on this

7    Sacramento, the one office in California for claims adjustors.

8    But, really, they were spread out all over and they weren't

9    reporting into Sacramento.  They weren't at Joel Canto's

10   meeting where he got up and said -- he stood up in front of

11   claims adjustors and said, you know, "We've got too many claims

12   to work in 38.75."  That's just not -- it's not that every

13   single claims adjustor was physically housed in Sacramento.

14   There were spread out all over the state and they weren't

15   reporting in to this office.  And so your focus on that

16   particular fact, I think, is inappropriate, so --

17        THE COURT:  I understand.  I mean, you and I disagree,

18   but I understand your argument.

19        I did also raise, and you can address it, this -- I'm

20   looking at it in front of me, the western claims zone overtime

21   guidelines which in writing it says that the claims associate

22   role is to manage time effectively during core business hours

23   and all nonexempt associates must request approval from the

24   managers prior to working overtime.  If more than four hours of

25   overtime is needed in a work week to account for an increase in

1    work volume or in preparation for being out of the office, the

2    associate director/director will review the request.

3         I mean, you understand and I understand, obviously,

4    that this is a case that at least from the plaintiff's point of

5    view is going to go back to 2004 -- what life was like before

6    they were declared nonexempt, that once they were declared

7    nonexempt all these claims adjustors were told that we're not

8    going to in any way adjust your workload, your work

9    requirements and that, again, nearly all of these claims

10   adjustors felt that management knew that you couldn't do your

11   job in 37 and a half hours, that it was a 50 to 60-hour --

12   again, I'm not saying you agree with this.  I'm just saying --

13        MR. OH:  No.

14        THE COURT:  -- from the plaintiff's point of view

15   that's the evidence in this case, that they're going to present

16   to the jury that they placed these plaintiffs in a position

17   where they now were required to do 50 to 60 hours worth of work

18   in 37 and a half hours and if they didn't do it in that period

19   of time, they would be deemed inefficient, ineffective.

20        MR. OH:  I know this isn't in the record, but may I

21   hand up to you --

22        THE COURT:  If it's not in the record, no, you can't

23   hand up anything.

24        MR. OH:  Okay.  So Joel Canto in that same email where

25   he asks what are your rules for overtime he says, "The most I

1   work per week --

2           THE COURT:  Why don't you answer my question?

3           MR. OH:  -- is maybe 1 to 3 hours."

4           THE COURT:  Why don't you address --

5           MR. OH:  Okay.  I'm sorry.  The question was?

6           THE COURT:  The impact of these overtime guidelines.

7           MR. OH:  Okay.  This is not -- I know you've been

8   humoring me.  I appreciate that.  For purposes of the, you

9   know, informal sur reply there was -- there are two documents

10  that I would like to hand up that are not part of the class

11  cert record.

12          THE COURT:  You cannot.  You cannot do that.

13  Absolutely prohibited.  There's no such thing, one, as an

14  informal sur reply; and two --

15          MR. OH:  Well, I'm asking you to humor me, that's all.

16          THE COURT:  Well, I'm not going to humor you because

17  it's also unfair, completely unfair for your opposing counsel

18  for you to throw up documents that aren't in the record, aren't

19  before the Court and that she hasn't had an opportunity to

20  address, so no.  If you're trying to introduce new evidence at

21  this late point in time --

22          MR. OH:  I would say, though, Your Honor --

23          THE COURT:  -- you can't do it.

24          MR. OH:  But, you know, we were under the impression

25  that this was a hearing and not a ruling and you came out with

1    a ruling without really giving me the chance to try to convince

2    you otherwise before you gave us the ruling.

3           THE COURT:  Well, if that's your impression, then you

4    obviously haven't talked to people who have appeared in my

5    court.  My hearings are rulings.  My rulings are hearings,

6    whatever way you want to say it.

7           MR. OH:  I have read transcripts, Your Honor, and so I

8    do know that there -- you have entertained argument and you

9    have certainly come out with predilections, but it hasn't been

10   as clear that you were making a ruling.  And most of the time

11   your ruling was at the end and sometimes it was after you took

12   a little bit of a break to decide.  That's why I thought I had

13   a chance before walking up.

14          THE COURT:  Well, again, that's not how this hearing

15   went.

16          MR. OH:  I understand.  Yeah.

17          THE COURT:  That's because I think the issue is so

18   clear.  I think the motion is not a difficult motion to decide.

19   And again, I know you disagree.  You've raised your points, I

20   considered your oppositions and the amount of documents you

21   submitted.  I just -- it wasn't a difficult issue for me,

22   honestly, Mr. Oh.

23          MR. OH:  Well, so with this being your ruling, Your

24   Honor, when does the time period start running for any -- does

25   it run from today or run from --

1          THE COURT:  The time period for what?

2          MR. OH:  Let's say a Rule 23(f) petition to the Ninth

3     Circuit.  Do you know does that run from today?

4          THE COURT:  Again, I'm going to adopt Ms. Workman's

5     proposed order.  There will be an order.  There will be a

6     minute order issued by my courtroom deputy just summarizing the

7     Court's ruling.  I'll actually use Ms. workman's proposed order

8     that she submitted at docket 63-4.  That will be filed probably

9     today if not tomorrow.  And in terms of when your time to

10    appeal runs, I don't answer legal questions.

11         MR. OH:  Okay.  I was just --

12         THE COURT:  You figure that out.

13         MR. OH:  There's going to be an order entered today?

14         THE COURT:  Well, there has been, in effect, an order

15    entered today.  I've granted the motion on the record.  I will,

16    as I said, confirm that by drafting or adopting and signing the

17    proposed order that's been submitted.  The only question I had

18    with respect to that proposed order -- I don't know if you've

19    gone through it --

20         MR. OH:  I do have two questions about -- the first

21    thing you said about the your time class, I want to make sure

22    on the record that for the your time class that --

23         THE COURT:  That only involves former.

24         MR. OH:  -- it only involves former but also only

25    involves the accrued but unused vacation upon termination.

1   We're not -- I believe that that is --

2          THE COURT:  The order reads "All former California

3   employees employed by Nationwide in the four years preceding

4   the original date of filing this lawsuit and the present who

5   accrued vacation time for which Nationwide did not pay them."

6          MR. OH:  Okay.  We can work out the contours of that.

7          And then, Your Honor, in terms of --

8          THE COURT:  I don't know how you'd work out the

9   contours.  That's the order that's going to be issued.

10          MR. OH:  In terms of the time to provide a class list,

11   since it's not a hundred people but it is all former employees

12   of Nationwide who worked during the agreed-upon time period --

13          THE COURT:  Four years preceding the original --

14          MR. OH:  We are going to need more time to put

15   together a class list than 10 days.  So I would request at

16   least 30 days to produce a class list.

17          THE COURT:  Do you have any problem with that?

18          MS. WORKMAN:  I do not, Your Honor.

19          THE COURT:  Okay.  Then there's a provision in here,

20   Ms. Workman, that you want me to order defendants to refrain

21   from engaging in any ex parte communications with class members

22   regarding the issues of this lawsuit without the permission of

23   the Court and defendants are not prevented from engaging in

24   conversations occurring -- I think you left out the word

25   "in" -- occurring in the normal course of business of class

1    members.  Can you live with that?  I know you don't like the

2    order itself, but do you have a problem with that language?

3             MR. OH:  Would you mind repeating that, Your Honor?

4             THE COURT:  The proposed order says, "It's further

5    ordered that as of the date of this order, defendant shall

6    refrain from engaging in any ex parte communications with class

7    members regarding issues of this lawsuit without the permission

8    of the Court.  Defendants are not prevented from engaging in

9    conversations occurring in the normal course of business with

10   class members."

11            MR. OH:  May I confer with my cocounsel?

12            THE COURT:  Sure.

13            MR. OH:  Yes, Your Honor.

14            THE COURT:  Okay.  Okay.  We have the -- I'll get the

15   proposed order on the docket.  Again, the motion is granted as

16   to those subclasses and the other paragraphs in your proposed

17   order, Ms. Workman, are also adopted, so appointing you,

18   designating you as the class counsel and designating

19   Mr. Mostajo and Ms. Quedens as the class representatives.

20            MS. WORKMAN:  Thank you, Your Honor.

21            THE COURT:  All right.  Look forward to seeing you

22   all.

23            MR. OH:  Thank you for giving me the time, Your Honor.

24            THE COURT:  You're welcome.

25         (Concluded at 2:47 p.m.)

1

2                         C E R T I F I C A T E

3

4        I certify that the foregoing is a true and correct

5   transcript of the record of proceedings in the above-entitled

6   matter.

7
    /s/ JENNIFER L. COULTHARD              February 26, 2020
8                                                  DATE

9

10  JENNIFER L. COULTHARD, RMR, CRR
    Official Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25