UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANTHONY MARC MOSTAJO, et al.,

Plaintiffs,

v.

NATIONWIDE MUTUAL INSURANCE COMPANY,

Defendant.

No.  2:17-cv-00350-DAD-AC

ORDER GRANTING MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND GRANTING MOTION FOR ATTORNEYS' FEES, COSTS, AND INCENTIVE AWARD

(Doc. Nos. 144, 145)

This matter came before the court on January 6, 2023, for a hearing on plaintiffs Anthony Marc Mostajo's and Elaine Quedens's unopposed motions for final approval of a class action settlement and for an award of attorneys' fees, costs, and incentive awards for plaintiffs.  (Doc. Nos. 144, 145.)  Attorney Robin G. Workman of the Workman Law Firm, PC appeared by video on behalf of plaintiffs and the class.  Attorneys John Battenfeld and Anahi Cruz of Morgan, Lewis & Bockius LLP appeared by video on behalf of defendant Nationwide Mutual Insurance Company ("Nationwide").  For the reasons set forth below, the court will grant final approval of

/////

/////

/////

1

the class action settlement and will grant the motion for attorneys' fees, costs, and incentive awards to plaintiffs.[1]

## BACKGROUND

The court previously summarized plaintiffs' allegations in its August 5, 2022 order granting plaintiffs' motion for preliminary approval of a class action settlement. (Doc. No. 141.) The court will not repeat that factual background in this order. Following the grant of preliminary approval in this action, this case was reassigned from Chief Judge Kimberly J. Mueller to the undersigned. (Doc. No. 142.)

---

[1] During the final approval hearing, the court questioned defendant's counsel regarding whether defendant sent notice of the proposed settlement to the appropriate federal and state officials, as is required by the Class Action Fairness Act ("CAFA") pursuant to 28 U.S.C. § 1715(b). Under § 1715(b), each defendant participating in the proposed settlement must serve notice of that settlement upon certain state and federal officials within ten days of the proposed settlement being filed in court, which in this case, would have been June 12, 2022. (*See* Doc. No. 138.) On January 11, 2023, following the final approval hearing, defendant's counsel filed a declaration informing the court that defendant did not send its CAFA notice to the appropriate federal and state officials under § 1715(b) until January 9, 2023. (Doc. No. 153 at 2.) In addition to requiring notice, CAFA also requires that "[a]n order giving final approval of a proposed settlement may not be issued earlier than 90 days after" the appropriate federal and state officials are served with notice. 28 U.S.C. § 1715(d). Although the court may hold a final approval hearing before the 90-day period under 28 U.S.C. § 1715(d) concludes, the court cannot grant final approval of a class action settlement until the ninety-day period concludes. *See Wilcox v. Swapp*, No. 2:17-cv-275-RMP, 2020 WL 2110411, at *1–2 (E.D. Wash. Apr. 22, 2020) (finding that the court may hold a final approval hearing within 90 days of the defendants providing notice under § 1715(d) because "as long as the relevant government officials are allowed ninety days to object to the settlement, the notice requirement has served its purpose"). Moreover, although defendant failed to timely comply with the notice requirements under CAFA, "late mailing of notices to state and federal officials under CAFA is not fatal to approval of settlements." *Adoma v. University of Phoenix, Inc.*, 913 F. Supp. 2d 964, 973 (E.D. Cal. 2012). Instead, the critical question is whether "state and federal government officials are allowed ninety days to object to the settlement or request to be heard." *Wilcox*, 2020 WL 21104111, at *2. On April 11, 2023, following the ninety-day CAFA notice period, defendant's counsel filed a declaration informing the court that defendant had not received any objections from any government officials in response to its CAFA notice. (Doc. No. 155.) Because the ninety-day notice period pursuant to § 1715(d) has now passed and defendant has not received any objections in response to its CAFA notice, the court now proceeds to issuing this order granting final approval of the proposed settlement. *See In re Processed Egg Products Antitrust Litigation*, 284 F.R.D. 249, 258 n.12 (E.D. Pa. 2012) (finding that although defendant's CAFA notice was untimely, "the substance of the [CAFA notice] requirements have been satisfied insofar as giving federal and state officials sufficient notice and opportunity to be heard" because such officials had ninety days after defendant's notice to request a hearing or object to the settlement).

On October 11, 2022, plaintiffs filed the pending unopposed motion for attorneys' fees, costs, and incentive awards for plaintiffs, and on November 1, 2022, plaintiffs filed the pending unopposed motion for final approval of the parties' class action settlement.  (Doc. Nos. 144, 145.)  As of the date of the hearing on January 6, 2023, no objections to the settlement had been received or filed with the court, and no class members have opted out of the settlement.  (*See* Doc. No. 145-1 at 13.)

As summarized by the court in its order granting preliminary approval of the parties' settlement, the settlement agreement provides for a settlement payment made by defendant in the amount of $3,800,000 (the "gross settlement fund").  (*See* Doc. No. 141 at 4.)  Assuming the parties' proposed allocations are awarded in full, approximately $2,105,000 (the "net settlement amount") will be available for distribution to participating class members.  (*See* Doc. No. 145-1 at 11.)

## FINAL CERTIFICATION OF SETTLEMENT CLASS

On February 26, 2020, the court granted plaintiffs' motion for class certification.  (Doc. No. 96.)  Specifically, the court certified the following two subclasses: [2]  (1) Subclass A, which is defined as the "class of persons employed by Nationwide as commercial lines claims adjusters in California" from January 9, 2013 through the date of preliminary approval; and (2) Subclass B, which is defined as "all former California employees employed by Nationwide" from January 9, 2013 through the date of preliminary approval "who accrued vacation time for which Nationwide

/////

---

[2]  The court's February 26, 2020 order specifies that the subclasses include individuals employed by defendant beginning "the four years preceding the original [January 9, 2017] date of filing this lawsuit to the present," i.e., January 9, 2013 through February 26, 2020.  (Doc. No. 96 at 2; *see also* Doc. No. 1 at 1).  The parties' settlement agreement and the court's order granting preliminary approval defines the relevant period of employment for the subclasses as extending through the date of preliminary approval, which was August 5, 2022.  (*See* Doc. Nos. 141 at 2; 138-2 at 38–39).  Although January 9, 2013 through August 5, 2022 is the relevant time period for determining an individual's membership in Subclasses A and B, the settlement agreement defines the class period as spanning "from January 9, 2013 through . . . January 31, 2022."  (*See* Doc. No. 138-2 at 32, 38–39.)  At the final approval hearing, class counsel and defense counsel clarified that the difference between the dates underlying subclass membership and the dates comprising the class period was intentional on behalf of the parties.

3

did not pay them."[3]  (Doc. No. 96 at 2–3; *see also* Doc. No. 141 at 2.)  The court also appointed

plaintiffs Anthony Marc Mostajo and Elaine Quedens as class representatives, the Workman Law

Firm, PC as class counsel, and RG/2 Claims Administration, LLC ("RG/2") as claims

administrator.  Because no additional substantive issues concerning the certification have been

raised, the court does not repeat its prior analysis here, and the court's prior appointments are

confirmed for settlement purposes.

**FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

Class actions require the approval of the district court prior to settlement.  Fed. R. Civ.

P. 23(e).  To approve a settlement, a district court must:  (i) ensure notice is sent to all class

members; (ii) hold a hearing and make a finding that the settlement is fair, reasonable, and

adequate; (iii) confirm that the parties seeking approval file a statement identifying the settlement

agreement; and (iv) be shown that class members were given an opportunity to object.  Fed. R.

Civ. P. 23(e)(1)–(5).  The settlement agreement in this action was previously filed on the court's

docket (*see* Doc. No. 138-2), and class members have been given an opportunity to object.  The

court now turns to the adequacy of notice and its review of the settlement following the final

fairness hearing.

**A.      Notice**

Adequate notice of the class settlement must be provided under Rule 23(e).  *Hanlon v.*

*Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998); *see also Silber v. Mabon*, 18 F.3d 1449,

1453–54 (9th Cir. 1994) (noting that the court need not ensure all class members receive actual

notice, only that "best practicable notice" is given); *Winans v. Emeritus Corp.*, No. 4:13-cv-

03962-HSG, 2016 WL 107574, at *3 (N.D. Cal. Jan. 11, 2016) ("While Rule 23 requires that

'reasonable effort' be made to reach all class members, it does not require that each individual

actually receive notice.").  "Notice is satisfactory if it 'generally describes the terms of the

settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

forward and be heard.'"  *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)

---

[3]  The parties estimate that there are approximately 121 members of Subclass A and 1,150
members of Subclass B, for a total of approximately 1,271 class members.  (Doc. No. 144-1 at 8.)

(quoting *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir. 1980)).  Any notice of the settlement sent to the class should alert class members of "the opportunity to opt-out and individually pursue any state law remedies that might provide a better opportunity for recovery." *Hanlon*, 150 F.3d at 1025.

The court previously reviewed the notice provided in this case at the preliminary approval stage and found it to be satisfactory, apart from the following two deficiencies that the court stated "must be remedied before any final approval."  (Doc. No. 141 at 16.)  First, the proposed notice to class members must be modified to "clarify class members' ability to appear at the final approval hearing without an attorney by adding 'with or without a lawyer' after 'attend the hearing' in the second sentence of this section title."  (*Id.*) (internal quotation marks omitted).  Second, "[t]he notice to new class members must be remedied to require only the minimum information from [new class members seeking exclusion from the class], before the notice is distributed."  (*Id.*)  Plaintiffs submitted the class notices sent to Subclasses A and B with their pending motion for final approval, and those revised notices reflect that these revisions were implemented.  (*See* Doc. No. 145-3 at 19, 30, 32.)

Following the grant of preliminary approval, the settlement administrator RG/2 conducted a National Change of Address search to update the list of class members with current addresses and then mailed the court-approved notice to the 1,271 class members.  (Doc. No. 145-1 at 12.)  After successfully remailing 88 notice packets that were initially returned as undeliverable, only two notice packets were ultimately undeliverable.  (*Id.* at 13.)  Thus, of the 1,271 total class members, 1,269 are estimated to have received actual notice of the settlement.

Given the above, the court accepts the reports of the settlement administrator and finds adequate notice has been provided, thereby satisfying Federal Rule of Civil Procedure 23(e)(1).  *Silber*, 18 F.3d at 1453–54; *Winans*, 2016 WL 107574, at *3.

**B.    Final Fairness Determination**

On January 6, 2023, the court held a final fairness hearing, at which class counsel and defense counsel appeared by video.  The court now must determine whether the settlement is fair, adequate, and reasonable.  *See* Fed. R. Civ. P. 23(e)(2).  At the final approval stage, the primary

inquiry is whether the proposed settlement is fundamentally "fair, adequate, and reasonable." *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir. 2012) (quoting Fed. R. Civ. P. 23(e)); *Hanlon*, 150 F.3d at 1026. "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Hanlon*, 150 F.3d at 1026 (citing *Officers for Justice v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615, 628 (9th Cir. 1982)); *see also Lane*, 696 F.3d at 818–19. Having already completed a preliminary examination of the agreement, the court reviews it again, mindful that the law favors the compromise and settlement of class action suits. *See, e.g.*, *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008); *Churchill Vill.,* 361 F.3d at 576; *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Officers for Justice*, 688 F.2d at 625. Ultimately, "the decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he [or she] is exposed to the litigants, and their strategies, positions and proof." *Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003) (quoting *Hanlon*, 150 F.3d at 1026).

> In assessing the fairness of a class action settlement, courts balance the following factors:

>> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill.*, 361 F.3d at 575; *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 964–67 (9th Cir. 2009).

/////

/////

/////

/////

/////

/////

/////

/////

6

These settlement factors are non-exclusive, and each need not be discussed if they are irrelevant to a particular case.  *Churchill Vill.*, 361 F.3d at 576 n.7.[4]

However, the Ninth Circuit has found that consideration of the *Churchill* factors alone is not sufficient to survive appellate review.  *See Briseño v. Henderson*, 998 F.3d 1014, 1022–26 (9th Cir. 2021) (holding that the revised Rule 23(e) requires district courts "to go beyond our precedent" and mandates consideration of "the *Bluetooth* factors" to all class action settlements, regardless of whether settlement was achieved before or after class certification); *see also* Fed. R. Civ. P. 23(e)(2)(C)–(D).  Under the revised Rule 23(e), "district courts must apply the *Bluetooth* factors to scrutinize fee arrangements . . . to determine if collusion may have led to class members being shortchanged."  *Briseño*, 998 F.3d at 1026.  The so-called *Bluetooth*

---

[4]  As part of the 2018 amendments to the Federal Rules of Civil Procedure, subsection (e)(2) was added to Rule 23, providing guidance to district courts in determining whether a class action settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In so determining, the court must consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> > (i) the costs, risks, and delay of trial and appeal;
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> > (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. Pro. 23(e)(2).  The purpose of the 2018 amendment was "not to displace any factor" previously generated by courts, "but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the propos[ed settlement]."  Fed. R. Civ. P. 23, Advisory Comm. Notes; *see Kang v. Wells Fargo Bank, N.A.*, No. 5:17-cv-06220-BLF, 2021 WL 5826230, at *14 (N.D. Cal. Dec. 8, 2021) ("Consideration of *Churchill* factors is not precluded by the 2018 amendment to Rule 23."); *Stoddart v. Express Servs.*, No. 2:12-cv-01054-KJM-CKD, 2021 WL 5761083, at *2 (E.D. Cal. Dec. 3, 2021) ("Before these provisions were incorporated into Rule 23(e), the Ninth Circuit and other courts used similar factors to decide whether settlement agreements in class actions were 'fair, reasonable, and adequate.'").

factors—also referred to as "subtle signs" of collusion—include:  (i) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded"; (ii) the existence of a "clear sailing" arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds," or a provision under which defendant agrees not to object to the attorneys' fees sought; and (iii) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (internal quotations and citations omitted).  "The presence of these three signs is not a death knell—but when they exist, 'they require[ ] the district court to examine them, . . . develop the record to support its final approval decision,' and thereby 'assure itself that the fees awarded in the agreement were not unreasonably high.'"  *Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021) (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1224 (9th Cir. 2015)).  Thus, while this court has wide latitude in determining whether a settlement is substantively fair, it is held to a higher procedural standard, and in order "[t]o survive appellate review . . . [it] must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections."  *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 606 (9th Cir. 2021) (quoting *Allen*, 787 F.3d at 1223–24).

     1.   <u>Strength of Plaintiffs' Case</u>

When assessing the strength of a plaintiff's case, the court does not reach "any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of th[e] litigation."  *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz. 1989).  The court cannot reach such a conclusion because evidence has not been fully presented.  *Id*.  Instead, the court "evaluate[s] objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements."  *Id*.

Plaintiffs assert that in continuing to litigate this action, they would have faced many challenges, despite their confidence in the strength of their claims.  (*See* Doc. No. 145-1 at 16.) Defendant "denies all of the claims and contentions alleged by Plaintiffs and asserted multiple

1   defenses to liability and damages."  (*Id.*)  In addition, defendant "made it clear that it intended to

2   file a decertification motion with respect to Subclass A, and intended to appeal the summary

3   adjudication ruling regarding Subclass B's claim."  (*Id.*)  According to plaintiffs, these challenges

4   contributed to plaintiffs' and class counsel's determination that the settlement reached was in the

5   best interests of the class.

6          Accordingly, the court finds that consideration of this factor weighs in favor of granting

7   final approval of the parties' settlement in this action.

8          2.      Risk, Expense, Complexity, and Likely Duration of Further Litigation

9          When considering whether the relief for the class is "adequate," the court must take into

10   account "the costs, risks, and delay of trial and appeal."  Fed. R. Civ. P. 23(e)(2)(C)(i).  "[T]here

11   is a strong judicial policy that favors settlements, particularly where complex class action

12   litigation is concerned."  *In re Syncor ERISA Litig.*, 516 F.3d at 1101 (citing *Class Plaintiffs*, 955

13   F.2d at 1276).  As a result, "[a]pproval of settlement is preferable to lengthy and expensive

14   litigation with uncertain results."  *Johnson v. Shaffer*, No. 2:12-cv-1059-KJM-AC, 2016 WL

15   3027744, at *4 (E.D. Cal. May 27, 2016) (citing *Morales v. Stevco, Inc.*, No. 1:09-cv-00704-

16   AWI-JLT, 2011 WL 5511767, at *10 (E.D. Cal. Nov. 10, 2011)).

17          Because of the aforementioned challenges, plaintiffs believe that "continued litigation

18   would likely result in common litigation issues such as increased expense, duration, and potential

19   appellate issues."  (Doc. No. 145-1 at 16.)  In addition, plaintiffs contend that "[e]mployment law

20   class actions are, by their nature, time-consuming and expensive to litigate."  (*Id.*) (citing *Aguilar*

21   *v Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 2214936, at *3 (E.D. Cal.

22   May 19, 2017).  Plaintiffs also note defendant's belief that the settlement would "avoid the

23   expense, inconvenience, and burden of further legal proceedings, and the uncertainties of trial and

24   appeals."  (*Id.*)  Because the information before the court suggests that there would be risk and

25   expense in seeking to prove plaintiffs' case at trial, consideration of this factor also weighs in

26   favor of granting final approval.

27   /////

28   /////

1        3.    Risk of Maintaining Class Action Status Throughout Trial

2        As noted above, plaintiffs represent that defendant "made it clear that it intended to file a

3  decertification motion with respect to Subclass A, and intended to appeal the summary

4  adjudication ruling regarding Subclass B's claim. (Doc. No. 145-1 at 16.)  Although plaintiffs do

5  not elaborate further on defendant's specific arguments with respect to these challenges, the court

6  is satisfied that defendant's challenges would have presented at least some risk that plaintiffs

7  would not be able to maintain a class action through trial.  Thus, consideration of this factor also

8  weighs in favor of granting final approval.

9        4.    Amount Offered in Settlement

10        To evaluate the fairness of the settlement award, the court should "compare the terms of

11  the compromise with the likely rewards of litigation." *Protective Comm. for Indep. Stockholders*

12  *of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968); *see also* Fed. R. Civ. P

13  23(e)(2)(C)–(D).  "It is well-settled law that a cash settlement amounting to only a fraction of the

14  potential recovery does not *per se* render the settlement inadequate or unfair." *In re Mego Fin.*

15  *Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).  To determine whether a settlement "falls

16  within the range of possible approval" a court must focus on "substantive fairness and adequacy,"

17  and "consider plaintiffs' expected recovery balanced against the value of the settlement offer." *In*

18  *re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078–80 (N.D. Cal. 2007) (citations omitted).  In

19  addition, the court must consider whether "the proposal treats class members equitably relative to

20  each other" and whether "the relief provided for the class is adequate." Fed. R. Civ. P.

21  23(e)(2)(C)–(D).

22        Here, the parties have agreed to a $3,800,000 gross settlement, allocated as follows:  (1)

23  up to $950,000 for attorneys' fees and up to $630,000 for class counsel's documented litigation

24  costs and expenses; (2) $25,000 incentive awards for both plaintiffs; (3) $50,000 in civil penalties

25  under the Private Attorneys General Act, California Labor Code § 2698, *et seq.* ("PAGA"), with

26  $37,500 of the penalties payable to the California Labor and Workforce Development Agency

27  /////

28  /////

1   ("LWDA") [5]; (4) up to $15,000 for settlement administration costs; and (5) the remainder of the

2   funds being allocated to the net settlement fund.  (Doc. No. 138-2 at 44.)  Defendant is

3   responsible for paying employer payroll taxes, which are not included in the gross settlement

4   fund.  (*Id.* at 34.)  Through the use of retained experts Jon Krosnick, PhD and Dwight Steward,

5   PhD, class counsel estimates that the maximum potential damages plaintiffs could recover in this

6   action totals $5,942,158.36, making the gross settlement fund an approximately 64% recovery of

7   plaintiffs' maximum potential damages.  (Doc. No. 145-1 at 16–17.)

8          Of the $2,105,000 net settlement fund, $750,000 will be allocated to the Subclass A net

9   settlement fund, with the remainder to be allocated to the Subclass B net settlement fund.  (Doc.

10   No. 138-2 at 38–39.)  These net settlement funds will be distributed to participating subclass

11   members on a pro rata basis based on the number of eligible workweeks worked by subclass

12   members.  (*Id.*)  Based on plaintiffs' current estimates of the net settlement funds, the average

13   amount Subclass A members are expected to recover is $6,198.35, and the average Subclass B

14   members are expected to recover is $1,111.57, with the largest payment to any class member

15   estimated to be $22,746.83.  (Doc. No. 145-1 at 18.)  The settlement is non-reversionary, and the

16   amount of any uncashed checks will be transmitted to the California State Controller's Unclaimed

17   Property Fund.  (*See* Doc. Nos. 138-2 at 54; 145-1 at 11–12.)

18          The proposed settlement amount is well within the general range of percentage recoveries

19   that California courts—including this one—have found to be reasonable.  *See, e.g.*, *Singh v.*

20   *Roadrunner Intermodal Servs, LLC*, No. 1:15-cv-01497-DAD-BAM, 2018 WL 2412325, at *7

21   (E.D. Cal. May 29, 2018), *modified,* 2018 WL 4382202 (E.D. Cal. Sept. 13, 2018) (approving a

22   settlement of about 12% of the estimated maximum damages); *Glass v. UBS Fin. Servs., Inc.*, No.

23   3:06-cv-04068-MMC, 2007 WL 221862, at *4 (N.D. Cal. Jan. 26, 2007) (approving a settlement

24   of about 25–35% of the estimated maximum).  As noted above, the court has received no

25   objections to the settlement, and no class members have sought to opt out of the settlement.  (*See*

26

27   [5]  Pursuant to the PAGA, 75% of the civil PAGA penalties, or $37,500, will go to the LWDA,
     and 25%, or $12,500, will be allocated to the net settlement fund.  (*See* Doc. No. 145-3 at 25); *see*
28   Cal. Lab. Code § 2699(i).

Doc. No. 145-1 at 12.)  Overall, based on the information presented to the court, the court concludes that the amount offered in settlement of this action does not appear to be unreasonable.

          a.     *PAGA Penalties Amount Offered in Settlement*

As described above, the settlement also provides for $50,000 in civil PAGA penalties. (Doc. No. 138-2 at 44.)  Under PAGA, 75% of the civil penalties, or $37,500, will go to the LWDA, and 25%, or $12,500, will be included in the net settlement amount.  (*See* Doc. No. 145-3 at 14); *see* Cal. Lab. Code § 2699(i).

Although there is no binding authority setting forth the proper standard of review for PAGA settlements, California district courts "have applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes.'"  *Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 972 (N.D. Cal. 2019).  This standard is derived from the LWDA.  In commenting on a proposed settlement including both class action and PAGA claims, the LWDA has offered the following guidance:[6]

> It is thus important that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

*O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citing the LWDA's guidance with approval).  Recognizing the distinct issues presented by class actions, this court is persuaded by the LWDA's reasoning in *O'Connor* and therefore adopts its proposed standard in evaluating the PAGA portion of the settlement now before the court.  *See id.*; *see, e.g.*, *Castro v. Paragon Indus., Inc.*, No. 1:19-cv-00755-DAD-SKO, 2020 WL 1984240, at *6 (E.D. Cal. Apr. 27, 2020); *Patel v. Nike Retail Servs., Inc.*, No. 3:14-cv-04781-RS, 2019 WL 2029061, at *2 (N.D. Cal. May 8, 2019).

---

[6]  The LWDA has also stated that it "is not aware of any existing case law establishing a specific benchmark for PAGA settlements, either on their own terms or in relation to the recovery on other claims in the action."  *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826-EMC (N.D. Cal. Jul. 29, 2016) (Doc. No. 736 at 2–3).

The proposed $50,000 penalty payment in this case represents 1.3% of the estimated $3,800,000 gross settlement amount.  The amount proposed to settle plaintiffs' PAGA claims is consistent with other PAGA settlements approved by this court.[7]  *See, e.g.*, *Castro*, 2020 WL 1984240, at *15 (approving PAGA penalties representing 2% of the gross settlement fund); *Syed v. M-I, LLC*, No. 1:12-cv-01718-DAD-MJS, 2017 WL 714367, at *13 (E.D. Cal. Feb. 22, 2017) (approving PAGA penalties representing 1.4% of the gross settlement fund); *Garcia v. Gordon Trucking, Inc.*, No. 1:10-cv-0324-AWI-SKO, 2012 WL 5364575, at *7 (E.D. Cal. Oct. 31, 2012) (approving PAGA penalties representing 0.27% of the gross settlement fund).  Moreover, class counsel has declared that the proposed settlement was submitted to the LWDA in accordance with PAGA, California Labor Code § 2699(l)(2), and attached supporting documentation for this submission.  (Doc. No. 138-2 at 14, 91.)

At the final approval hearing, class counsel confirmed that the LWDA did not provide any response to their submission.  Having reviewed the parties' submission and the terms of the proposed settlement, the court finds that the settlement amount related to plaintiffs' PAGA claims is fair, reasonable, and adequate in light of PAGA's public policy goals.

Thus, the court finds that the amount offered in settlement of the PAGA claims here weighs in favor of granting final approval of the settlement.

    5.    <u>Extent of Discovery Completed and Stage of the Proceedings</u>

"In the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement."  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998)

---

[7]  In the court's order granting preliminary approval, the court noted that plaintiff's expert provided an estimate of the value of Subclass A's PAGA claims, but not an estimate of the value of Subclass B's PAGA claims.  (Doc. No. 141 at 13.)  The court stated that "[w]ithout additional information about the estimated value of the PAGA claims for Subclass B, the court cannot evaluate whether the $50,000 allocated to the PAGA penalty is fundamentally fair, adequate, and reasonable."  (*Id.* at 13–14.)  At the final approval hearing, defense counsel clarified that the PAGA claims for Subclass B were dismissed earlier in the litigation of this action, which explains why plaintiffs' expert only estimated the value of Subclass A's PAGA claims.  The court is satisfied with this explanation and thus need not analyze whether the proposed $50,000 penalty payment is fundamentally fair, reasonable, and adequate with respect to Subclass B in particular.

(quoting *In re Chicken Antitrust Litig.*, 669 F.2d 228, 241 (5th Cir. 1982)).  Approval of a class

action settlement thus "is proper as long as discovery allowed the parties to form a clear view of

the strengths and weaknesses of their cases." *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D.

443, 454 (E.D. Cal. 2013).  A settlement is presumed fair if it "follow[s] sufficient discovery and

genuine arms-length negotiation." *Adoma v. Univ. of Phx., Inc.*, 913 F. Supp. 2d 964, 977 (E.D.

Cal. 2012) (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D.

Cal. 2004)).  The court must consider whether the process by which the parties arrived at their

settlement is truly the product of arm's length bargaining, rather than collusion or fraud.  *Millan

v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).  These concerns are also

reflected in Rule 23(e)(2)'s focus on procedural fairness—whether "the class representatives and

class counsel have adequately represented the class" and whether "the proposal was negotiated at

arm's length." Fed. R. Civ. P. 23(e)(2)(A)–(B).

As detailed in the court's order granting preliminary approval, the court is satisfied that

the parties' negotiations constituted genuine and informed arm's length bargaining.  (Doc. No.

141 at 10.)  The parties entered into private mediation with "an experienced wage and hour

mediator" after "years of discovery and motion practice, retaining experts, and securing

certification of the Subclasses."  (Doc. No. 138-1 at 20.)  Moreover, in advance of mediation,

defendant produced over 45,000 documents, the parties "conducted tomes of written discovery

and took many depositions," and the parties "retained experts to assist counsel in evaluating the

potential value of the claims alleged."[8]  (Doc. No. 145-1 at 19.)

Accordingly, the court concludes that consideration of this factor weighs in favor of

granting final approval.

6.      Experience and Views of Counsel

Class counsel has submitted a declaration by attorney Workman describing her experience

in wage and hour class action litigation.  (*See* Doc. No. 138-2 at 10–14; *see also* Doc. No. 145-3

---

[8]  In the court's order granting preliminary approval, the court directed the parties to file their
mediation briefs *in camera* at the final approval stage.  (Doc. No. 141 at 10.)  The parties
complied with this directive, and the court has reviewed these briefs.

at 7–9.)  Attorney Workman submits that she graduated from Texas Tech School of Law in 1989

and that her legal practice has focused on "prosecuting wage and hour class action litigation."

(*Id.* at 10.)  In addition, she states that she "routinely" represents clients with respect to issues

involving California employment law and has provided a sample list of such cases she and/or her

firm have worked on during her career.  (*Id.* at 10–14.)

The court finds that the view of class counsel that the proposed settlement is fair and

reasonable weighs in favor of granting final approval.

7. Presence of a Governmental Participant

The settlement agreement contemplates payment of $37,500 of the settlement amount to

the LWDA under PAGA.  (Doc. No. 41-1 at 21–22.)  This too weighs in favor of approval of the

settlement.  *See Adoma*, 913 F. Supp. 2d at 977 (factoring civil PAGA penalties in favor of

settlement approval); *Zamora v. Ryder Integrated Logistics, Inc.*, No. 3:13-cv-02679-CAB-BGS,

2014 WL 9872803, at *10 (S.D. Cal. Dec. 23, 2014) (same).

8. Reaction of the Class Members

"It is established that the absence of a large number of objections to a proposed class

action settlement raises a strong presumption that the terms of a proposed class settlement action

are favorable to the class members."  *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 529 (citing

cases).  The presumption that a settlement is fair, reasonable, and adequate is particularly strong

when there is an absence of a single objection to a proposed class action settlement.  *See id.*;

*Barcia v. Contain-A-Way, Inc.*, No. 3:07-cv-00938-IEG-JMA, 2009 WL 587844, at *4 (S.D. Cal.

Mar. 6, 2009).  "A court may appropriately infer that a class action settlement is fair, adequate,

and reasonable when few class members object to it."  *Cruz v. Sky Chefs, Inc.*, No. 4:12-cv-

02705-DMR, 2014 WL 7247065, at *5 (N.D. Cal. Dec. 19, 2014) (citing *Churchill Vill.*, 361 F.3d

at 577).

According to plaintiffs, no member of the class has filed an objection to the settlement

pending before the court for final approval, and no class member has requested exclusion from

/////

/////

15

1    the settlement.[9]  (Doc. No. 145-1 at 13.)  Moreover, no class members raised any objections to the

2    settlement at the final fairness hearing.  Accordingly, consideration of this factor weighs

3    significantly in favor of granting final approval.

4         9.        Subtle Signs of Collusion

5         The court now turns to a review of whether any of the "more subtle signs" of collusion

6    recognized by the Ninth Circuit are present here.  *See Bluetooth*, 654 F.3d at 947.

7         First, the court does not find that class counsel is seeking a disproportionate distribution of

8    the settlement, particularly in light of the fact that the award of attorneys' fees sought here—25%

9    of the gross settlement fund—is the benchmark rate in the Ninth Circuit.  (*See* Doc. No. 138-2 at

10   44); *see, e.g.*, *Morales*, 2011 WL 5511767, at *12 ("The typical range of acceptable attorneys'

11   fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the

12   benchmark.") (quoting *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000)); *Castro v.*

13   *Paragon Indus., Inc.*, No. 1:19-cv-00755-DAD-SKO, 2021 WL 20242333, at *5, *12 (E.D. Cal.

14   May 21, 2021) (granting final approval of a class and collective action settlement with an average

15   individual class member recovery of $1,070.62 and an award of $1,031,250.00 in attorneys' fees).

16        Second, the settlement here includes a version of a "clear sailing" arrangement, in which

17   defendant agreed not to oppose plaintiffs' request for a maximum award of 25% of the gross

18   settlement fund.  (Doc. No. 138-2 at 44.)  Although the "very existence of a clear sailing

19   provision increases the likelihood that class counsel will have bargained away something of value

20   to the class," *Bluetooth*, 654 F.3d at 948 (citation omitted), the existence of a clear sailing

21   provision is not necessarily fatal to final approval.  Rather, "when confronted with a clear sailing

22   provision, the district court has a heightened duty to peer into the provision and scrutinize closely

23   the relationship between attorneys' fees and benefit to the class."  *Id.* (citing *Staton*, 327 F.3d at

24   954).  Although plaintiffs do not squarely address the "clear sailing" in their pending motion, they

25   contend that awarding one-fourth of the gross settlement fund is well-supported by case law and

26   _____

27   [9]  In 2020, following the certification of the class, 21 individuals requested exclusion from the
     class in response to a "2020 Notice of Pendency of Class Action Lawsuit."  (*See* Doc. No. 145-4

28   at 3, 6.)  These requests for exclusion were made approximately two years prior to the filing of
     the motion for preliminary approval in this action.  (*See generally* Doc. No. 138.)

1   warranted based on the recovery achieved in this case in light of the risks taken.  (*See* Doc. No.

2   144-1 at 18.)  Plaintiffs argue that class counsel "prosecuted this case on a contingency basis,

3   having no guarantee of ever getting paid" and "carried the financial burden of prosecuting this

4   case for more than five years."  (*Id.*)  The court further notes again that none of the class members

5   have objected to this settlement or requested to be excluded from it.

6         Third, the parties did not arrange for an unawarded amount of fees to revert to

7   defendants.  Rather, settlement checks that are not cashed before their expiration will be cancelled

8   with those funds to be transmitted to the California State Controller's Unclaimed Property Fund.

9   (Doc. No. 138-2 at 54.)

10         Based upon its consideration of all of these factors, the court is satisfied that the subtle

11   signs of collusion that the Ninth Circuit has warned of are not sufficiently present here to warrant

12   rejecting the parties' proposed settlement.

13         In sum, after considering all of the relevant factors, the court finds on balance that the

14   settlement is fair, reasonable, and adequate.  *See* Fed. R. Civ. P. 23(e).  Accordingly, the court

15   will grant plaintiff's motion for final approval of the parties' class action settlement.

16                   **ATTORNEYS' FEES, COSTS, AND INCENTIVE PAYMENTS**

17         As noted above, plaintiffs have also submitted a motion seeking awards of attorneys' fees,

18   class counsel's litigation expenses, settlement administrator costs to RG/2, and incentive awards

19   for plaintiffs Mostajo and Quedens.  (Doc. No. 144.)

20   **A.     Attorney's Fees**

21         This court has an "independent obligation to ensure that the award [of attorneys' fees],

22   like the settlement itself, is reasonable, even if the parties have already agreed to an amount."

23   *Bluetooth*, 654 F.3d at 941.  This is because, when fees are to be paid from a common fund, the

24   relationship between the class members and class counsel "turns adversarial."  *In re Mercury*

25   *Interactive Corp. Secs. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010); *In re Wash. Pub. Power Supply*

26   *Sys. Secs. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  As such, the district court assumes a

27   fiduciary role for the class members in evaluating a request for an award of attorneys' fees from

28   /////

1  the common fund. *In re Mercury*, 618 F.3d at 994; *see also Rodriguez v. Disner*, 688 F.3d 645,

2  655 (9th Cir. 2012); *West Publ'g Corp.*, 563 F.3d at 968.

3  The Ninth Circuit has approved two methods for determining attorneys' fees in such cases

4  where the attorneys' fee award is taken from the common fund set aside for the entire settlement:

5  the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290

6  F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The district court retains discretion in

7  common fund cases to choose either method. *Id.*; *Vu v. Fashion Inst. of Design & Merch.*, No.

8  2:14-cv-08822-SJO-EX, 2016 WL 6211308, at *5 (C.D. Cal. Mar. 22, 2016). Under either

9  approach, "[r]easonableness is the goal, and mechanical or formulaic application of either

10  method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v.*

11  *Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002). As noted above, the

12  Ninth Circuit has generally set a 25% benchmark for the award of attorneys' fees in common

13  fund cases. *Id.* at 1047–48; *see also Bluetooth*, 654 F.3d at 942 ("[C]ourts typically calculate

14  25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation

15  in the record of any 'special circumstances' justifying a departure.").

16  Reasons to vary the benchmark award may be found when counsel achieves exceptional

17  results for the class, undertakes "extremely risky" litigation, generates benefits for the class

18  beyond simply the cash settlement fund, or handles the case on a contingency basis. *Vizcaino*,

19  290 F.3d at 1048–50; *see also In re Online DVD-Rental*, 779 F.3d at 954–55. Ultimately,

20  however, "[s]election of the benchmark or any other rate must be supported by findings that take

21  into account all of the circumstances of the case." *Vizcaino*, 290 F.3d at 1048. The Ninth Circuit

22  has approved the use of lodestar cross-checks as a way of determining the reasonableness of a

23  particular percentage recovery of a common fund. *Id.* at 1050 ("Where such investment is

24  minimal, as in the case of an early settlement, the lodestar calculation may convince a court that a

25  lower percentage is reasonable. Similarly, the lodestar calculation can be helpful in suggesting a

26  higher percentage when litigation has been protracted."); *see also In re Online DVD-Rental*, 779

27  F.3d at 955.

28  /////

Here, the parties' settlement provides that class counsel will seek an award of 25% of the settlement, equivalent to $950,000.  (Doc. No. 138-2 at 44.)  No class member has objected to any part of the settlement, including the amount of attorneys' fees sought.  (*See* Doc. No. 145-1 at 12.)  The court approved plaintiffs' request for attorneys' fees on a preliminary basis, finding that the requested fee amount of $950,000 appeared "perfectly reasonable and well within the Ninth Circuit's norms," but previewed that the court would conduct a cross-check of the proposed fee award against the lodestar amount.  (Doc. No. 141 at 11.)

The court next turns to the lodestar calculation in order to cross-check the reasonableness of the requested attorneys' fee award.  Where a lodestar is merely being used as a cross-check, the court "may use a 'rough calculation of the lodestar.'"  *Bond v. Ferguson Enters., Inc.*, No. 1:09-cv-1662-OWW-MJS, 2011 WL 2648879, at *12 (E.D. Cal. June 30, 2011) (quoting *Fernandez v. Victoria Secret Stores, LLC*, No. 2:06-cv-04149-MMM-SH, 2008 WL 8150856 (C.D. Cal. July 21, 2008)).  Moreover, beyond simply the multiplication of a reasonable hourly rate by the number of hours worked, a lodestar multiplier can be applied.  "Multipliers in the 3–4 range are common in lodestar awards for lengthy and complex class action litigation."  *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995) (citing *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988)); *see also* 4 Newberg on Class Actions § 14.7 (stating courts typically approve percentage awards based on lodestar cross-checks of 1.9 to 5.1 or even higher, and "the multiplier of 1.9 is comparable to multipliers used by the courts"); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998) ("[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.") (quoting 4 Newberg on Class Actions § 14.7).

Here, class counsel asserts that the total lodestar amount without any multiplier is $1,359,348.50.  (Doc. Nos. 144-1 at 19; 144-2 at 7.)  Under this calculation, class counsel's lodestar exceeds the requested one-fourth of the gross settlement amount by $409,348.50.  In support of this lodestar calculation, class counsel has submitted an accounting of the hours billed by various firm employees, tasks completed by those employees, and applicable billing rates.  (*See* Doc. No. 144-2 at 7, 21–110.)  The Workman Law Firm, PC employees who worked on this

19

1   matter include:  a paralegal with an hourly rate of $200; a law clerk with an hourly rate of $200; a

2   third-year attorney with an hourly rate of $375; and three attorneys with over thirty years of

3   experience with hourly rates ranging from $650 through $750.  (*See id.* at 7.)  The court finds that

4   these rates are fair and reasonable in this case.  *See Singh v. Roadrunner Intermodal Servs., LLC*,

5   No. 1:15-cv-01497-DAD-BAM, 2019 WL 316814, at *10 (E.D. Cal. Jan. 24, 2019) (accepting

6   hourly rates of between $370 and $495 for associates, and $545 and $695 for senior counsel and

7   partners); *Sanchez v. Frito-Lay, Inc.*, No. 1:14-cv-00797-DAD-BAM, 2021 WL 1813190, at *9–

8   10 (E.D. Cal. May 6, 2021) (accepting hourly rate of $200 for paralegals); *Mathein v. Pier 1

9   Imports (U.S.), Inc.*, No. 1:16-cv-00087-DAD-SAB, 2018 WL 1993727, at *11 (E.D. Cal. Apr.

10   27, 2018) (accepting hourly rates of between $475 and $575 for associates, and $675 and $750

11   for senior counsel and partners); *Emmons v. Quest Diagnostics Clinical Labs., Inc.*, 1:13-cv-

12   00474-DAD-BAM, at *8 (E.D. Cal. Feb. 27, 2017) (accepting hourly rates of between $330 and

13   $550 for associates, and $500 and $720 for partners).  For the reasons set forth above, the court

14   concludes that the lodestar cross-check supports the requested award of $950,000 in attorneys'

15   fees, an amount equal to 25% of the gross settlement fund in this case.  Therefore, the court will

16   approve an award of $950,000 in attorneys' fees.

17   **B.       Costs and Expenses of Class Counsel**

18          Additionally, class counsel seeks to recover the costs and expenses advanced while

19   prosecuting this litigation.  Such awards "should be limited to typical out-of-pocket expenses that

20   are charged to a fee paying client and should be reasonable and necessary."  *In re Immune

21   Response Secs. Litig.*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007).  These can include

22   reimbursements for:  "1) meals, hotels, and transportation; 2) photocopies; 3) postage, telephone,

23   and fax; 4) filing fees; 5) messenger and overnight delivery; 6) online legal research; 7) class

24   action notices; 8) experts, consultants, and investigators; and 9) mediation fees."  *Id.*

25          Here, class counsel requests reimbursement in the amount of $629,222.04.  (Doc. No.

26   144-1 at 23.)  In the court's order granting preliminary approval, the court noted that:

27              Combined with the [attorneys'] fees, this amount could bring the
              total fees and expenses to $1,580,000, or 41.5 percent of the [gross
28              settlement fund].  If class counsel were awarded the maximum fees

1

2

plus expenses, the total dollar figure would exceed 75 percent of the $2,105,000 that the parties have agreed to allocate to Subclasses A and B.

3

4

5

(Doc. No. 141 at 11.)  For this reason, the court cautioned that unless counsel provided additional authority in support of the requested costs, "the court offers no assurance that the proposed [cost award] . . . will be approved."  (Doc. No. 141 at 11–13.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

Plaintiffs submit that the costs class counsel incurred include administrative costs, court and filing costs, photocopying charges, deposition and hearing transcript fees, expert and consultant fees, delivery fees, Belaire notice-mailing fees,[10] research fees, conference call charges, and document repository fees.[11]  (Doc. No. 144-1 at 23.)  The vast majority of the requested cost award—$562,283.67—is comprised of expert and consultant fees.  (*See id.*)  At the final approval hearing, class counsel explained that these sizeable fees were incurred due to the stage of litigation to which this action proceeded prior to settlement.  Class counsel asserted that because the parties reached a settlement after expert disclosures were provided, class counsel had engaged in and completed significant work to effectively prosecute this action in preparation for an eventual trial.  Specifically, plaintiffs allege that class members were required to work "off-the-clock," but because this work was allegedly performed while employees were "off-the-clock," there are no (or limited) records documenting this work.  Accordingly, class counsel asserted that in order to prepare to prove damages at trial, it was necessary for class counsel to retain three different types of experts:  one to design a survey to collect information about off-the-clock work, one to manage the collection of responses to that survey, and one to perform the mathematical

22

23

24

25

26

[10]  More specifically, class counsel incurred $8,998.97 in fees from RG/2 described as "Belaire Notice mailing fees."  (*See* Doc. Nos. 144-1 at 23; 144-2 at 110.)  At the final approval hearing, class counsel clarified that this expense pertains to work RG/2 completed in connection with discovery in this action, prior to the parties reaching the proposed settlement agreement.  Because this expense was incurred in connection with discovery, rather than pursuant to settlement administration, this $8,998.97 fee is not accounted for in the $15,000 allocated to settlement administration costs pursuant to the proposed settlement.  The $8,998.97 fee may thus be properly awarded as part of class counsel's costs and expenses in litigating this action.

27

28

[11]  Plaintiffs represent that the requested $629,222.04 in costs does not include "expenses incurred to file and serve the approval motions and to participate in the hearings."  (Doc. No. 144-1 at 23.)

calculations using the information collected in that survey.  Class counsel further stated it is her

experience that the expert costs for such surveys total at least in the range of $250,000 to

$500,000.  In addition, class counsel acknowledged the unfortunate nature of such substantial

expert and consultant fees—which ultimately reduce the amount class members are able to

recover in a settlement—and expressed that she does explore options with respect to engaging

more affordable experts.  However, class counsel also explained that it is of paramount

importance to select reputable experts whose qualifications and work can withstand the myriad

challenges a defendant may bring to attack the credibility of an expert or the substance of that

expert's survey.  Indeed, class counsel represented that her decision to retain experts in this action

who she deemed to be potentially more costly, but well-qualified, was reasonable, because

defendant Nationwide eventually filed a motion to strike one of class counsel's expert reports in

this action, and class counsel characterized that motion as containing strong arguments.  (Doc.

No. 80).

In light of class counsel's detailed explanation regarding the appropriateness of engaging

experts and consultants in this action, the court finds that the specific circumstances of this case

rendered the retention of plaintiffs' experts and consultants reasonable.  The court's finding in

this regard is further strengthened by class counsel's representation at the final approval hearing

that class counsel sought attorneys' fees in the amount of 25% of the gross settlement fund, rather

than 33% of the gross settlement fund, in part due to the class counsel's acknowledgement of the

significant expert/consultancy fees incurred in prosecuting this action and the desire to maximize

the amount remaining in the settlement fund available for distribution to participating class

members.  Accordingly, having reviewed the costs and expenses submitted to the court and

finding all the charges incurred to be reasonable, the court will approve the reimbursement of

costs and expenses in the amount requested.

## C.    Incentive Award

Courts frequently approve "service" or "incentive" awards in class action cases.  *West

Publ'g Corp.*, 563 F.3d at 958–59.  Generally speaking, incentive awards are meant to recognize

the effort of class representatives "for work done on behalf of the class, to make up for financial

1   or reputational risk undertaken in bringing the action, and, sometimes, to recognize their

2   willingness to act as a private attorney general." *Id*.  The district court evaluates each award

3   individually, using "relevant factors includ[ing] the actions the plaintiff has taken to protect the

4   interests of the class, the degree to which the class has benefitted from those actions, . . . the

5   amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e]

6   fear[s of] workplace retaliation." *Staton*, 327 F.3d at 977 (quoting *Cook v. Niedert*, 142 F.3d

7   1004, 1016 (7th Cir. 1998)).

8          The courts of the Ninth Circuit typically find incentive awards of $5,000 to be

9   "presumptively reasonable." *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 457, 463

10  (9th Cir. 2000) (endorsing $5,000 service awards to named representatives); *Bellinghausen v.*

11  *Tractor Supply Co.*, 306 F.R.D. 245, 246 (N.D. Cal. 2015) (collecting cases); *In re Toys R Us-*

12  *Del., Inc. FACTA Litig.*, 295 F.R.D. 438, 470–72 (C.D. Cal. 2014) (awarding plaintiffs $5,000

13  each "consistent with the amount courts typically award as incentive payments").  Higher

14  amounts can be appropriate, such as in employment actions, where a plaintiff risks retaliation or

15  blacklisting by as a result of suing her employer.  *See, e.g.*, *Buccellato v. AT&T Operations, Inc.*,

16  No. 5:10-cv-00463-LHK, 2011 WL 4526673, at *4 (N.D. Cal. June 30, 2011).

17         Here, plaintiffs Mostajo and Quedens seek incentive awards of $25,000 each for their

18  service in this action.  (Doc. No. 144-1 at 7.)  In the court's order granting preliminary approval,

19  the court noted that "the proposed $25,000 incentive award for each class representative appears

20  to be on the high end of such awards" and cautioned that "[b]efore final approval, plaintiffs must

21  provide additional information to allow the court's full consideration of whether the proposed

22  incentive fees here are warranted under all the circumstances."  (Doc. No. 141 at 11–12.)

23         Plaintiffs contend that the requested amount is fair and reasonable compensation for the

24  risks and efforts they have undertaken as representative plaintiffs in this action.  (Doc. No 144-1

25  at 13.)  They submit that they have spent "hundreds of hours" assisting in the prosecution of this

26  case, including through obtaining and providing documents, providing information regarding

27  defendant's policies and procedures, submitting to multiple depositions, attending the deposition

28  of a manager at one time employed by defendant, responding to discovery requests, and

1    participating in mediation.  (*Id.*; Doc. Nos. 138-5 at 8; 138-4 at 10.)  Plaintiff Mostajo declares

2    that he spent at least 150 hours on the case, and plaintiff Quedens declares that she spent at least

3    130 hours on the case.  (Doc. Nos. 138-5 at 8; 138-4 at 10.)  Plaintiffs also assert that they "put

4    their future employment prospects at risk by becoming class representatives" because

5    "[e]mployers routinely screen employee candidates to determine whether they have ever filed a

6    suit against other employers, allowing them to screen out litigious candidates."  (Doc. No. 144-1

7    at 14.)

8           The incentive awards sought here—a combined $50,000 or 1.3 % of the gross settlement

9    fund—is noticeably higher than the typical enhancement award in this district.  *See, e.g.*, *Taylor v.*

10   *FedEx Freight, Inc.*, No. 1:13-cv-01137-DAD-BAM, 2016 WL 6038949, at *9 (E.D. Cal. Oct.

11   13, 2016) (describing the requested $25,000 incentive award as "indeed more than the typical

12   enhancement award in this circuit, where $5,000 is presumptively reasonable").  Nonetheless, the

13   court acknowledges that the estimated 150 hours and 130 hours of time expended by the

14   representative plaintiffs in prosecuting this case also appears to be higher than the hours expended

15   by named plaintiffs in many other class action settlements in which this court has granted

16   incentive awards.  *Castro*, 2021 WL 2042333, at *13 (granting $10,000 award for 70 hours of

17   work over three years); *Acosta v. Evergreen Moneysource Mortg. Co.*, No. 2:17-cv-00466-KJM-

18   DB, 2019 WL 6051117, at *18 (E.D. Cal. Nov. 15, 2019) (granting $10,000 award for 40 hours

19   of work).  In addition, the court finds persuasive class counsel's assertions at the final approval

20   hearing regarding the representative plaintiffs' extensive efforts in this action, which include:

21   attending multiple depositions; engaging in lengthy commutes between Stockton and San

22   Francisco in order to attend such depositions, rendering significant assistance to class counsel in

23   the over-five years of litigation of this action prior to the parties reaching a settlement, and

24   providing assistance with the in-depth discovery in this action.  At the final approval hearing,

25   class counsel also noted that excluding the amount received in incentive awards, plaintiff

26   Mostajo's estimated settlement payment is $5,827.34 and plaintiff Quedens's is $8,773.28.  (*See*

27   Doc. No. 145-4 at 4.)  In light of class counsel's estimate that the largest settlement award in this

28   action will be $22,746.83, class counsel contends that the requested $25,000 incentive awards

would not result in a disproportionate recovery for the named plaintiffs in comparison with the recovery of other class members.  (*See id.*)  The court considers the estimated *average* recovery amount for class members—as opposed to the *largest* estimated recovery amount for any class member—to be a more useful heuristic for determining whether the requested incentive award would result in a disproportionate recovery for the named plaintiffs in comparison to class members.  (*See* Doc. No. 145-1 at 18.); *see also Newell v. Ensign United States Drilling (Calif.) Inc.*, No. 1:19-cv-01314-NONE-JLT, 2021 WL 6000227, at *18 (E.D. Cal. Dec. 20, 2021) (comparing the amounts of the requested incentive awards to the estimated average settlement award for class members in order to assess whether the requested incentive awards were "disproportionate").  Nonetheless, considering the named plaintiffs significant work on behalf of the class, the duration of this litigation, and the estimated average settlement award in this action—$6,198.35 for Subclass A and $1,111.57 for Subclass B—the court agrees with class counsel that an award of $25,000 to each of the named plaintiffs is not disproportionate here and would fairly compensate plaintiffs Mostajo and Quedens for their considerable efforts in assisting with the prosecution of this action.  *See West Publ'g Corp.*, 563 F.3d at 958–59.

Accordingly, the court finds that incentive awards of $25,000 to each of the named plaintiffs would be fair and reasonable and would not destroy the adequacy of class representation in light of the unique circumstances of this case.  *See Newell*, 2021 WL 6000227, at *16–18 (granting preliminary approval of proposed $35,000 and $25,000 incentive awards where the median settlement payment was $3,948, one of the named plaintiffs spent in excess of 275 hours assisting with case, and one of the named plaintiffs was laid off during the pendency of the case, potentially due in part to him being named as a plaintiff in the case); *c.f. Taylor*, 2016 WL 6038949, at *8 (reducing incentive award from $25,000 amount requested to $15,000); *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 335 (N.D. Cal. 2014) (granting a $10,000 incentive award to a plaintiff who spent more than 200 hours assisting with case and faced professional risks as a result of serving as a representative plaintiff).

Accordingly, the court will award $25,000 to plaintiff Mostajo and $25,000 to plaintiff Quedens.

**D.      Settlement Administrator Costs**

As noted above, the court has approved the appointment of RG/2 as the settlement administrator in this action.  According to the declaration of Tina M. Chiango, a director of claims administration for RG/2, the total cost for administration of this settlement is anticipated to be $15,000.  (Doc. No. 145-4 at 1, 4.)  The court finds these administration costs reasonable and will direct payment in the requested amount.

**CONCLUSION**

For the reasons stated above:

1.      Plaintiff's motion for final approval of the class action settlement (Doc. No. 145) is granted, and the court approves the settlement as fair, reasonable, and adequate;

2.      Plaintiff's motion for an award of attorneys' fees and costs, incentive award, and settlement administrator costs (Doc. No. 144) is granted;

3.      The court awards the following sums:

a.      Class counsel shall receive $950,000 in attorneys' fees and $629,222.04 in expenses;

b.      Plaintiff Mostajo shall receive $25,000 as an incentive payment;

c.      Plaintiff Queden shall receive $25,000 as an incentive payment;

d.      RG/2 shall receive $15,000 in settlement administration costs; and

e.      The parties shall direct payment of 75% of the settlement allocated to the PAGA payment, or $37,500, to the LWDA as required by California law, and the remainder of the PAGA payment, $12,500, shall be included in the net settlement fund;

4.      The parties are directed to effectuate all terms of the settlement agreement and any deadlines or procedures for distribution set forth therein;

/////

/////

/////

/////

5.   This action is dismissed with prejudice in accordance with the terms of the parties'

amended settlement agreement, with the court specifically retaining jurisdiction

over this action for the purpose of enforcing the parties' settlement agreement; and

6.   The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:   **April 12, 2023**

_____
UNITED STATES DISTRICT JUDGE